IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In re the Welfare of: | ) | No. 32490-7-III |
| | ) | |
| | ) | |
| | ) | PUBLISHED OPINION |
| K.J.B. | ) | |
| | ) | |
| | ) | |

LAWRENCE-BERREY, J. — The trial court terminated J.B.'s parental rights to his daughter, K.J.B. J.B. appeals, contending that the trial court erred in (1) finding that the Department of Social and Health Sciences (Department) satisfied the notice requirements of the Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. §§ 1901-1963; (2) finding that all necessary services were expressly and understandably offered or provided; (3) failing to consider the amended language of RCW 13.34.180(1)(f) applicable to an incarcerated parent; and (4) finding that it was in K.J.B.'s best interests to terminate J.B.'s parental rights. We agree with J.B.'s third contention, but determine that the error was harmless, and we disagree with his other contentions. We therefore affirm.

FACTS

The Department received a referral for K.J.B. on April 20, 2012, the day she was born. The referral was based on the mother testing positive for methamphetamine one month prior to her daughter's birth. Because of the mother's methamphetamine and cigarette use, K.J.B. has asthma and reactive airway disease. She is required to use a nebulizer almost every day. Her condition requires that her caregiver be vigilant concerning the odors and environment to which she is exposed. Her caregiver must immediately take action if K.J.B. shows any signs of breathing difficulties.

The Department filed a dependency petition for K.J.B. on April 24, 2012. By court order, the Department originally placed K.J.B. with a relative but soon after moved her to foster care placement. On October 22, 2012, the court held a dispositional hearing and entered an order of dependency. The order reaffirmed K.J.B.'s placement in foster care. The order also required J.B. to complete the following services and to follow provider recommendations: drug and alcohol evaluation and treatment, random urinalysis (UA) testing, and parenting assessment and instruction.

*Drug and alcohol evaluation and treatment.* J.B. completed a drug and alcohol evaluation on May 6, 2013. The evaluation revealed methamphetamine dependence and nicotine dependence, and the recommendation was intensive inpatient treatment. J.B. was

2

scheduled to enter inpatient treatment on May 20, 2013, but he did not do so. In June 2013, he started intensive outpatient treatment. J.B. participated in the outpatient treatment program in July and August 2013 but then left the program due to a relapse. On September 12, 2013, he entered an intensive inpatient treatment program but left the program without completing it on September 21, 2013. J.B. stated he left the intensive drug treatment program because he was "uncomfortable with the fact that [he] was . . . getting sober . . . and . . . dealing with [his] issues . . . instead of us[ing] drugs to mask them," which he was not ready to do at that time. Report of Proceedings (RP) at 13.

On December 18, 2013, J.B. went to detox and planned to begin inpatient treatment after finishing detox. He only stayed at detox for four days and did not go to inpatient treatment. He made no other attempts to obtain drug addiction treatment before he was incarcerated on January 24, 2014.

*Random UA testing.* J.B. was ordered to provide random UA tests five times per month beginning in January 2013. J.B. provided six random UAs during this time: one per month in February, March, May, and August, and two in April. Four of these tests were negative, while two were positive.

*Parenting assessment.* J.B. completed a parenting assessment and participated in parenting instruction with parent educator Esteban Cabrera in July and August 2013. In a

3

report dated September 9, 2013, Mr. Cabrera recommended that J.B. complete inpatient substance abuse treatment, individual and couple's counseling once he completed the inpatient treatment, and consistent visitation with K.J.B. Because Mr. Cabrera recommended completion of substance abuse treatment first, the Department did not make referrals for counseling services at that time.

Social worker Sonny Laform, who was assigned to the case in October 2013, referred J.B. to Catholic Family and Child Services for individual and family counseling on December 18, 2013. This referral coincided with J.B.'s entry into detox and plan to go to inpatient treatment thereafter. J.B. did not complete the referral for counseling.

*Parental visits.* J.B. participated in visits with K.J.B. in January 2013 and regularly from March 2013 to January 2014, missing only a few visits within that time period.

*Incarceration.* On January 24, 2014, J.B. was found guilty of first degree unlawful possession of a firearm and possession of a stolen firearm. He was sentenced to 74 months of incarceration. He was incarcerated at the time of the March 2014 termination trial. While incarcerated, J.B. never sought contact with K.J.B. nor contacted Mr. Laform to ask about K.J.B.

*ICWA notices.* K.J.B.'s mother indicated she is Native American and identified herself as having Cherokee, Hopi, and Cree ancestry. J.B. submitted a declaration stating he has Blackfoot ancestry through his father, and he gave his father's name and date of birth. His declaration also stated that his great, great grandmother was full-blooded Cree, but he did not know her name or date of birth. The Department prepared a Family Ancestry Chart. The chart failed to identify J.B. or his father as having Blackfoot ancestry. The Department submitted notice of the pendency of parental termination proceedings to various Cherokee, Cree, and Hopi tribes. No notice was sent to the Blackfoot tribe. Accompanying each notice was the before-described Family Ancestry Chart. For each notice sent to an individual tribe, the Department provided a copy to the Bureau of Indian Affairs (BIA). The Department did not receive any response from the various tribes or the BIA.

The Department filed a termination petition on May 8, 2013. The case proceeded to a termination trial on March 17-18, 2014. One month prior to trial, K.J.B.'s mother consented to an order terminating her parental rights to her daughter. At the time of trial, K.J.B. had been in a safe and stable foster care home for 22 months, and had an opportunity for adoption into a permanent family with her foster parents.

J.B. testified at trial that he was not going to be available to K.J.B. in the near future due to his incarceration. He estimated his early release date from prison was just under four years from the time of trial. J.B. acknowledged that he still needs drug treatment and stated that he is now ready to get treatment. He stated that no parent should be under the influence of drugs while raising a child and that using drugs has an impact on the ability of a parent to provide a stable and permanent home for a child. He also testified that he tried to keep in contact with the Department as much as possible throughout the dependency, while working two jobs and battling his drug addiction.

Cristy Benge, who conducted J.B.'s original drug and alcohol evaluation, testified that J.B. is still in need of substance abuse treatment.

Social worker Marcinna Heine-Rath, assigned to the case from February 2013 to October 2013, testified that prior to leaving intensive inpatient treatment in September 2013, J.B. "seemed motivated to do what was in the best interest for his daughter" and "[h]ad been making [the] most of his visits." RP at 75. She testified that after leaving treatment, J.B. reported that he had been going to Alcoholics Anonymous meetings and connecting with his sponsor.

Ms. Heine-Rath observed several visits between J.B., K.J.B, and K.J.B.'s mother, and one visit between J.B. and K.J.B. only. She testified the visits went well, with the

parents playing with K.J.B. and interacting with her. Ms. Heine-Rath testified she felt K.J.B.'s mother was a trigger for J.B. and his sobriety. At the time of trial, J.B. was still in a relationship with K.J.B.'s mother.

When asked why she did not make a referral for J.B. to do individual counseling after receiving Mr. Cabrera's report, Ms. Heine-Rath testified, "The recommendation was for [J.B.] to complete [counseling] after he successfully completed his inpatient treatment." RP at 103. She stated that if J.B. had completed inpatient treatment, she would have made a recommendation for individual or couple's counseling.

Finally, Ms. Heine-Rath testified she believes continuation of the parent-child relationship diminishes K.J.B.'s prospects for early integration into a stable and permanent home because K.J.B. needs the security of a permanent home. She also stated that termination of J.B.'s parental rights is in K.J.B.'s best interest so that K.J.B. can move on and be a legal part of her foster family.

Mr. Cabrera also testified at trial, stating J.B.'s parenting questionnaire showed he "has some common sense as far as what parenting is and what you should do." RP at 124. Mr. Cabrera observed one visit between both parents and K.J.B. and testified J.B. was nurturing and loving toward K.J.B., showing compassion and sensitivity toward her. However, he described the bond between them as "[d]istant." RP at 138. J.B.'s

7

interaction with K.J.B. was minimal, standing back and allowing the mother to parent K.J.B., because he did not want to "further stress" the child. RP at 137.

Mr. Cabrera also testified that "in talking with [J.B.] and identifying stresses in his life, it turned more [into] an individual counseling session than it did into a parenting instruction." RP at 122. He stated J.B.'s health questionnaire indicated some stress in his life, including substance abuse and his relationship with K.J.B.'s mother. Mr. Cabrera also stated J.B.'s relationship with K.J.B.'s mother was one of the triggers in his life. He described J.B.'s family history as "[v]ery harsh, very physical, had a lot of abuse, parents weren't very instructive, wasn't raised in a structured home, parents didn't provide him with any boundaries or limits." RP at 123.

As to his recommendation for couple's counseling, Mr. Cabrera testified he did not specify an exact time for J.B. to start but that he "encouraged him to start as soon as possible." RP at 139. He stated there may be some benefit for a person starting couple's counseling while actively using methamphetamine, but that it would not be as effective.

Finally, Mr. Cabrera testified that generally speaking, it is normal for substance abuse and mental health issues to occur simultaneously, and that a mental health issue can sometimes be a precipitating event to substance abuse. Additionally, he stated it is not uncommon for people with mental health issues to self-medicate by using street drugs.

Mr. Laform testified that he made the referral for individual and family counseling so that those services would be available to J.B. after he completed his inpatient substance abuse treatment. He also testified that his referral for counseling services asked the service provider to do a mental health intake or assessment so "the practitioner could properly diagnose if he had any sort of mental health diagnosis that might be affecting his behaviors or leading him to using drugs and alcohol." RP at 199. He testified this request was made because he believed "it was important that if in fact there was a co-occurring issue that we could address it." RP at 199. However, he believed J.B. should take substantial steps in his substance abuse treatment prior to the mental health intake being conducted. A mental health assessment was never court ordered, and Mr. Laform had no reason to believe the father had a mental health issue or co-occurring disorder.

Mr. Laform testified that overall J.B. had a "semi-engagement" in his court-ordered services because he had not followed through with his chemical dependency treatment. RP at 184. He also stated J.B. was "wonderful" in maintaining contact with the Department, but that J.B. has not contacted him since his incarceration in January 2014. RP at 184-85. However, Mr. Laform admitted he does not accept collect calls, he did not provide J.B. with preaddressed stamped envelopes so he could communicate with him, and he assumed J.B. had his address available to him while incarcerated.

Mr. Laform testified that he believed continuation of the parent-child relationship diminishes K.J.B.'s prospects for early integration into a stable and permanent home because it would be a disruption to K.J.B.'s integration into her current foster family. Additionally, he stated that termination of J.B.'s parental rights is in K.J.B.'s best interests so that she can stay in her current home, be adopted by her current foster family, and move forward in her life.

Guardian ad litem Mischa Theall testified that termination of J.B.'s parental rights was in K.J.B.'s best interests based on her need for permanency. Ms. Theall did not observe J.B. and K.J.B. together.

At the close of trial, the trial court entered an oral ruling and also written findings of fact and conclusions of law terminating J.B.'s parental rights. In ordering termination, the court found that the Department offered J.B. all necessary services. The court also found that all elements of RCW 13.34.180 had been established by clear, cogent, and convincing evidence. Finally, the court found that J.B. was unfit to parent and that termination was in K.J.B.'s best interests. In making these findings, the court noted that there was no evidence of J.B. having a mental health issue requiring a mental health assessment or counseling, and even if there was a potential mental health issue, experts agreed J.B.'s drug addiction needed to be addressed first. The court also noted that J.B.'s

10

incarceration will make him unavailable for an extended period of time to engage in services or to parent K.J.B.

J.B. appeals.

## ANALYSIS

Where the trial court has weighed the evidence, appellate review is limited to determining whether the court's findings of fact are supported by substantial evidence and whether those findings support the court's conclusions of law. *In re Dependency of P.D.*, 58 Wn. App. 18, 25, 792 P.2d 159 (1990). "Evidence is substantial if it is sufficient to persuade a fair-minded person of the truth of the declared premise." *In re Welfare of S.J.*, 162 Wn. App. 873, 881, 256 P.3d 470 (2011). When deciding whether substantial evidence supports the findings of fact, the appellate court must consider "'the degree of proof required.'" *In re Dependency of A.M.M.*, 182 Wn. App. 776, 785-86, 332 P.3d 500 (2014) (quoting *P.D.*, 58 Wn. App. at 25). For termination proceedings, the burden is "clear, cogent, and convincing evidence." *A.M.M.*, 182 Wn. App. at 784-85. Thus, "the question on appeal is whether there is substantial evidence to support the findings in light of the highly probable test." *P.D.*, 58 Wn. App. at 25. Unchallenged findings are verities on appeal. *In re Mahaney*, 146 Wn.2d 878, 895, 51 P.3d 776 (2002). Finally, the trial

court's credibility determinations receive deference on appeal from an order terminating

parental rights. *A.M.M.*, 182 Wn. App. at 786.

1.    *Whether the Department satisfied the ICWA notice requirements*

J.B. contends that the trial court erred in finding that the Department complied

with the notice requirements of the ICWA. He argues the Department should have

notified the Blackfoot tribe of the termination proceedings. He also argues that the

Department's failure to comply with ICWA's notice requirements resulted in the trial

court lacking jurisdiction to hear the termination proceeding.

The ICWA grants tribes the right to intervene in state court custody proceedings

involving an "Indian child." 25 U.S.C. § 1911(c); *see also* RCW 13.38.090. The statute

defines "Indian child" as "any unmarried person who is under age eighteen and is either

(a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is

the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4); *see also*

RCW 13.38.040(7). The Department must notify "the Indian child's tribe" or the BIA[1] of

_____

[1] The BIA must be notified if a tribe's identity or location cannot be determined.
25 U.S.C. § 1912(a). "Under the interpretive regulations, notice of the termination
proceeding shall be sent to the appropriate BIA Area Director under the Secretary of the
Interior." *In re Welfare of M.S.S.*, 86 Wn. App. 127, 136, 936 P.2d 36 (1997) (citing 25
C.F.R. § 23.11(b)). More specifically, for proceedings in Washington State, "the
regulations require that notice be sent to the Portland, Oregon BIA office." *Id.* (citing 25
C.F.R. § 23.11(c)(11)).

such pending proceedings and the tribe's right to intervene "where the court knows or has reason to know that an Indian child is involved."

25 U.S.C. § 1912(a); *see also* RCW 13.38.070(1). However, only federally recognized tribes[2] are entitled to § 1912(a) notice. *In re Welfare of L.N.B.-L.*, 157 Wn. App. 215, 239, 237 P.3d 944 (2010). "The State has the burden of proving that the notices sent complied with the ICWA." *In re Dependency of E.S.*, 92 Wn. App. 762, 771, 964 P.2d 404 (1998).

Here, the parties agree that there was reason to know K.J.B. could be an Indian child. On February 12, 2014, J.B. submitted a declaration stating he has Blackfoot and Cree ancestry. K.J.B.'s mother also indicated she is Native American. The Department submitted notice of termination proceedings to several Cherokee, Cree, and Hopi Indian tribes, and provided copies of these notices to the BIA as well. The Department did not receive any responses.

---

[2] The ICWA defines "Indian tribe" as "any Indian tribe, band, nation, or other organized group or community of Indians *recognized as eligible for services* provided to Indians by the Secretary because of their status as Indians." 25 U.S.C. § 1903(8) (emphasis added). A list of "Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs" is published yearly in the Federal Register. *See* Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs, 80 Fed. Reg. 1942-48 (Jan. 14, 2015).

The parties disagree as to whether the Department was required to notify the

Blackfoot tribe of the proceedings. The Department contends it did not notify the

Blackfoot tribe because the Blackfoot tribe is not federally recognized[3] and is "different

and distinguishable" from the Blackfeet tribe, which is federally recognized. Response to

Motion for Accelerated Review at 19.

This court's other two divisions have decided cases with similar issues where a

party claimed Blackfoot ancestry and the Department did not notify the Blackfoot tribe.

In Division Two's decision, *Welfare of L.N.B.-L.*, the court determined the record

contained insufficient evidence "to demonstrate that the 'Black Foot out of the Algonquin

Nation' refers to the federally-recognized Blackfeet Tribe of the Blackfeet Indian

Reservation of Montana." 157 Wn. App. at 238 n.20. Because the Department failed to

notify the Cherokee and "Black Foot" tribes, the court remanded for proper notice to

both. *Id.* at 238. However, because the identity of the "Black Foot" tribe was not clear

from the record, the court stated the Department "should, on remand, notify the Portland

area director of the [BIA] of the termination orders." *Id.* at 238 n.20.

In Division One's decision, *In re Dependency of J.A.F.*, the court determined the

record was sufficient where the Department provided general notice to the BIA that the

---

[3] The Federal Register only lists the Blackfeet Tribe of the Blackfeet Indian

14

action possibly involved "Indian children" without listing any affiliation with a particular tribe, and the BIA responded, "'The child was determined to be non-Indian by Superior Court: therefore the Indian Child Welfare Act of 1978 does not apply. Do *not* send future notices.'" 168 Wn. App. 653, 664-65, 278 P.3d 673 (2012) (emphasis in original). The Department received this response from the BIA prior to trial. Then, on the first day of trial, the children's mother testified that she possibly had "Barefoot" tribe ancestry but later stated it could have been Blackfoot instead. *Id.* at 665. The Department investigated the matter by contacting the party's father but did not send any further notices to tribes or to the BIA based on the mother's testimony. *Id.* Nonetheless, the court found the Department's general notice to the BIA sufficient to fulfill its obligation under ICWA. *Id.* at 666.

In this case, J.B. concedes that the Department was required to notify only federally recognized tribes. The Department cites Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs, 79 Fed. Reg. 4748-53 (Jan. 29, 2014) to support its assertion that the Blackfeet tribe is federally recognized but the Blackfoot tribe is not and that the two are distinct tribes. J.B. does not contest this assertion. Nor do we find any evidence in the record to contest the

Reservation of Montana. Indian Entities Recognized and Eligible, 80 Fed. Reg. at 1943.

15

Department's assertion. Because the record is clear that the Blackfoot tribe is not a

federally recognized tribe and because there is no evidence that J.B. was confused

concerning the two tribes, the Department was not required to notify either the

unrecognized Blackfoot tribe or the recognized Blackfeet tribe of this proceeding. The

Department therefore complied with the ICWA notice requirements.

2.      *Whether all necessary services were expressly and understandably offered or provided*

When deciding whether to terminate the parental rights of a parent, Washington

courts apply a two-step process. *In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232 P.3d

1104 (2010). "The first step focuses on the adequacy of the parents" and requires the

Department to prove, by clear, cogent, and convincing evidence, the six termination

factors set forth in RCW 13.34.180(1).[4] *Id.* "'Clear, cogent and convincing' means

---

[4] The six termination factors that the Department must prove in a termination
hearing are:
>       (a)  That the child has been found to be a dependent child;
>       (b)  That the court has entered a dispositional order pursuant to
> RCW 13.34.130;
>       (c)  That the child has been removed or will, at the time of the
> hearing, have been removed from the custody of the parent for a period of
> at least six months pursuant to a finding of dependency;
>       (d)  That the services ordered under RCW 13.34.136 have been
> expressly and understandably offered or provided and all necessary
> services, reasonably available, capable of correcting the parental
> deficiencies within the foreseeable future have been expressly and

highly probable." *In re Welfare of M.R.H.*, 145 Wn. App. 10, 24, 188 P.3d 510 (2008). If the Department meets its burden as to the six termination factors, "the trial court must find by a preponderance of the evidence that termination is in the best interests of the child." *Id.* (citing RCW 13.34.190(2)). Only if the first step is satisfied may the court reach the second step. *A.B.*, 168 Wn.2d at 911.

J.B. asserts that the Department did not timely offer or provide him with individual counseling, couple's counseling, and a mental health assessment. To satisfy its statutory burden under RCW 13.34.180(1)(d), the Department must offer or provide "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future." A service is "necessary" if it is needed to address a condition that

---

understandably offered or provided;

　　(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future.

　　. . . .

　　(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. If the parent is incarcerated, the court shall consider whether a parent maintains a meaningful role in his or her child's life based on factors identified in RCW 13.34.145(5)(b); whether the department or supervising agency made reasonable efforts as defined in this chapter; and whether particular barriers existed as described in RCW 13.34.145(5)(b) including, but not limited to, delays or barriers experienced in keeping the agency apprised of his or her location and in accessing visitation or other meaningful contact with the child.

RCW 13.34.180(1).

precludes reunification of the parent and child. *In re Welfare of C.S.*, 168 Wn.2d 51, 56 n.3, 225 P.3d 953 (2010). The Department must tailor the services offered to the individual's needs. *In re Dependency of T.R.*, 108 Wn. App. 149, 161, 29 P.3d 1275 (2001). However, because RCW 13.34.180(1)(d) limits the services required to those capable of remedying parental deficiencies in the "foreseeable future," the trial court can find that the Department offered all reasonable services "[w]here the record establishes that the offer of [other] services would be futile." *M.R.H.*, 145 Wn. App. at 25.

J.B. contends that the Department's three-month delay in referring him to individual counseling, couple's counseling, and a mental health assessment made the referrals untimely. He also argues that the delay in providing these services was inconsistent with parent educator Esteban Cabrera's recommendation. He points to Mr. Cabrera's testimony that he encouraged J.B. to start counseling as soon as possible and also Mr. Cabrera's recommendation that J.B. "*continues* [sic] to participate in ongoing individual and couple's therapy to address unresolved issues of trauma related symptoms (i.e. rejection, guilt, etc.), after his successful completion of inpatient treatment." Ex. 6 (Parenting Assessment Summary for J.B. dated Sept. 9, 2013) (emphasis added).

J.B.'s arguments are not supported by substantial evidence. Social worker Marcinna Heine-Rath testified that she did not make a referral for counseling services

after receiving Mr. Cabrera's report because she believed Mr. Cabrera's recommendation was for J.B. to complete counseling after he successfully completed his inpatient drug treatment. Mr. Cabrera testified he did not specify a time for J.B. to start counseling services in his written recommendations. And while J.B. focuses on the "continues" verbiage of the recommendation, he ignores the clause "after his successful completion of inpatient treatment" at the end of that same sentence. Thus, the evidence presented at trial confirms that the Department acted consistent with Mr. Cabrera's recommendations to wait to make the referrals for counseling.

After hearing this evidence, the trial court found "[t]he assessment recommended that the father complete drug/alcohol in-patient treatment, participate in individual and couples counseling *once he completed in-patient treatment.*" CP at 20 (emphasis added). "Because the trial court has the opportunity to hear the testimony and observe the witnesses, its decision is entitled to deference." *S.J.*, 162 Wn. App. at 881. Consequently, the trial court's credibility determinations receive deference on appeal from an order terminating parental rights. *A.M.M.*, 182 Wn. App. at 786. Substantial evidence supports the trial court's finding as to the timing of the referral for counseling services.

J.B. also contends that the counseling and mental health assessment were necessary services for correcting his identified parenting deficiency of substance abuse and thus should have been offered concurrently with his substance abuse treatment. J.B. argues the evidence demonstrated he has trauma-related health issues that are co-occurring with his substance abuse.

For his assertion that he has mental health issues co-occurring with his substance abuse, J.B. references testimony by Mr. Cabrera and social worker Sonny Laform that mental health issues can lead to substance abuse and that they can be co-occurring issues. He also cites Mr. Cabrera's testimony that it is not uncommon for people with mental health issues to self-medicate by using street drugs. However, the record indicates both witnesses were testifying generally about co-occurring mental health issues and drug use, rather than specifically as to J.B.

J.B. also relies on *S.J.*, 162 Wn. App. 873. There, the trial court's dispositional order required the mother to complete, among other services, substance abuse evaluation and treatment and mental health services. *Id.* at 876. The Department knew that the mother suffered from mental illness and substance abuse issues but failed to adequately provide integrated mental health and drug treatment services. *Id.* at 881-82. The *S.J.* court noted the legislative finding that co-occurring mental health and drug dependency

issues are best resolved when treatment of both issues is integrated. *Id.* at 882. Based on this finding, the *S.J.* court held that the Department failed to tailor the services to the parent's needs. *Id.*

*S.J.* is distinguishable from this case. J.B.'s court-ordered services were drug and alcohol evaluation and treatment, random UA testing, and parenting assessment and instruction. A mental health assessment and mental health counseling were never ordered. Additionally, none of the social workers involved in the case testified that J.B. had a mental health issue that required evaluation or services.

Mr. Cabrera testified that during his sessions with J.B., J.B. indicated he had a difficult childhood and also identified several stressors in his life, including his substance abuse and his relationship with K.J.B.'s mother. However, Mr. Cabrera did not recommend a mental health evaluation or mental health services. He only recommended counseling. Mr. Laform was the only person to recommend a mental health assessment. He testified that his December 18, 2013 referral for counseling services asked the service provider to do a mental health intake or assessment so "the practitioner could properly diagnose if he had any sort of mental health diagnosis that might be affecting his behaviors or leading him to using drugs and alcohol." RP at 199. But Mr. Laform also stated he had no reason to believe that J.B. had a mental health issue or co-occurring

21

disorder. Thus, the trial court's finding that there was no evidence of J.B. having a mental health issue requiring a mental health assessment or treatment was supported by substantial evidence.

J.B. next argues that had the Department made referrals for counseling services earlier, the services would not have been futile. The record contradicts this argument. Mr. Laform testified he believed J.B. should take substantial steps in his substance abuse treatment prior to the mental health intake being conducted. He also testified that overall J.B. had a "semi-engagement" in his court-ordered services because he had not followed through with his chemical dependency treatment. RP at 184.

Relatedly, the trial court entered findings that:

> 1.20 The father has not been able to demonstrate sobriety for any significant period of time, despite being provide [sic] ample time and opportunity to do so. He has engaged in criminal activity due to his addiction. He described how his drug addiction impacted . . . him and his family and made him unavailable to parent. . . . He has attempted treatment multiple times and has failed.
>
> 1.21 . . . The father has a substance abuse addiction and continues to struggle with sobriety. He has not been able to complete treatment and continues to relapse. Although he indicates he is ready for treatment at this time, he will be incarcerated for up to 74 months and will not be able to complete services in the near future. He still needs to complete treatment and demonstrate his ability to maintain sobriety once he is released from incarceration. The near future for the child is a few months, not years. The father's needs far exceed the near future timeframe for the child.

CP at 21. The trial court ultimately found that all necessary services reasonably available had been offered, and that "[t]here is little likelihood that conditions will be remedied so that the child can be returned to her father in the near future." CP at 21.

J.B. does not challenge these findings of fact, and the court's unchallenged findings are verities on appeal. *Mahaney*, 146 Wn.2d at 895. Additionally, these findings are supported by substantial evidence, and they support the conclusion that this termination factor was satisfied. J.B. admitted at trial that he was not going to be available to K.J.B. in the near future due to his incarceration. He estimated his early release date from prison was just under four years from the time of trial. He acknowledged that he still needs drug treatment and stated that he is now ready to get treatment.

Thus, the record establishes that the offer of counseling services or a mental health assessment any earlier in the dependency would have been futile because of his continued drug use. The trial court's finding that the services ordered under RCW 13.34.136 had been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future had been expressly and understandably offered or provided is supported by substantial evidence.

23

3.      *Whether continuation of the parent-child relationship diminished K.J.B.'s prospects for early integration into a stable and permanent home*

J.B. contends that the Department failed to prove all the necessary elements to show that continuation of his relationship with K.J.B. clearly diminishes her prospects for early integration into a stable and permanent home. Specifically, he argues that the trial court failed to consider the 2013 amendment to RCW 13.34.180(1)(f) regarding incarcerated parents.

The 2013 amendment at issue in this case is emphasized here:

> That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. *If the parent is incarcerated, the court shall consider whether a parent maintains a meaningful role in his or her child's life based on factors identified in RCW 13.34.145(5)(b); whether the department or supervising agency made reasonable efforts as defined in this chapter; and whether particular barriers existed as described in RCW 13.34.145(5)(b) including, but not limited to, delays or barriers experienced in keeping the agency apprised of his or her location and in accessing visitation or other meaningful contact with the child.*

RCW 13.34.180(1)(f) (emphasis added). This new language references RCW 13.34.145(5)(b), which provides a nonexhaustive list of six factors the court may also consider as part of its "meaningful role" assessment. These factors include:

> (i) The parent's expressions or acts of manifesting concern for the child, such as letters, telephone calls, visits, and other forms of communication with the child;

(ii) The parent's efforts to communicate and work with the department or supervising agency or other individuals for the purpose of complying with the service plan and repairing, maintaining, or building the parent-child relationship;

(iii) A positive response by the parent to the reasonable efforts of the department or the supervising agency;

(iv) Information provided by individuals or agencies in a reasonable position to assist the court in making this assessment, including but not limited to the parent's attorney, correctional and mental health personnel, or other individuals providing services to the parent;

(v) Limitations in the parent's access to family support programs, therapeutic services, and visiting opportunities, restrictions to telephone and mail services, inability to participate in foster care planning meetings, and difficulty accessing lawyers and participating meaningfully in court proceedings; and

(vi) Whether the continued involvement of the parent in the child's life is in the child's best interest.

RCW 13.34.145(5)(b).

The statute's legislative history suggests the purposes of the 2013 amendment are to assure that a parent's incarceration should no longer tip the balance toward termination, and to require courts to make individualized determinations when deciding whether an incarcerated person's parental rights should be terminated. SUBSTITUTE H.B. 1284, 63d Leg., Reg. Sess. (Wash. 2013).

In support of his argument that the trial court erred, J.B. relies on *A.M.M.* In *A.M.M.*, Division One of this court reversed a termination order because there was no evidence in the record that the trial court considered the 2013 amendment to

25

RCW 13.34.180(1)(f). *A.M.M.*, 182 Wn. App. at 786-87. There, the father was incarcerated for all but a month and one-half of the dependency. *Id.* at 780.

The Department attempts to distinguish *A.M.M.* by arguing that here the incarcerated parent was incarcerated for only 51 days at the end of the entire dependency. The Department's argument would be persuasive but for the mandatory language contained in the amended statute. RCW 13.34.180(1)(f) provides that "[*i*]*f the parent is incarcerated*, the court *shall* consider" three factors. (Emphasis added.) The first is whether the parent "maintains a meaningful role in his or her child's life," the second is whether the Department made reasonable efforts to remedy the parental deficiencies, and the third is whether barriers of incarceration interfered with the parent's efforts to maintain meaningful contact with the child and participate in required assessments, services, and court proceedings. The amended statute does not contain an exception to the mandatory language. We therefore will not imply one.

Nevertheless, a failure to weigh the required considerations will not require reversal if the State's case is strong or if the factors are not contested. *In re Termination of M.J. & M.J.*, Nos. 32321-8-III, 32322-6-III; 2015 WL 1945057, at *5 (Wash. Ct. App. Apr. 28, 2015). Here, once incarcerated, J.B. made no effort to play a meaningful role in his daughter's life. The record also establishes that the

26

Department made reasonable attempts to remedy J.B.'s parental deficiencies.

Finally, there is no evidence that barriers of incarceration impacted J.B.'s ability to maintain meaningful contact with his daughter nor is there evidence that barriers of incarceration impacted J.B.'s required assessments, services, or his ability to participate in court proceedings. Therefore, unlike *A.M.M.*, we conclude that the trial court's failure to weigh the required considerations was harmless error, which does not require reversal.

4.      *Whether it was in K.J.B.'s best interests to terminate J.B.'s parental rights*

J.B. argues that the trial court erred when determining it was in his daughter's best interests to terminate his parental rights. He argues that the trial court erred in determining this second step without first requiring the Department to establish the six elements of the first step.

The best interests analysis is the second step in a two-step process for termination proceedings. *In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232 P.3d 1104 (2010). The court may only reach this second step if the first step—review of the six termination factors listed above—is satisfied. *Id.* The court must find by a preponderance of the evidence that termination is in the child's best interests. *M.R.H.*, 145 Wn. App. at 24

27

No. 32490-7-III
*In re Welfare of K.J.B.*

(citing RCW 13.34.190(2)). "[I]t is 'premature' for the trial court to address the second step before it has resolved the first." *A.B.*, 168 Wn.2d at 925.

Because we resolved the first step in favor of the Department, and because the factual record firmly establishes the second step, we affirm the trial court's determination that it was in the best interests of K.J.B. to terminate J.B.'s parental rights.

Lawrence-Berrey, J.

WE CONCUR:

Brown, A.C.J.

Fearing, J.

28