IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Parental Rights to | ) | |
| | ) | No. 32941-1-III |
| J.E.L.D. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |

FEARING, J. — John Downs appeals the termination of his parental rights to his daughter Jessie. He claims that insufficient evidence supports the trial court's findings that led to the termination order. A complication in the appeal arises from Downs' incarceration during much of Jessie's young life. Downs also contends that unsworn testimony by Jessie's guardian ad litem, after the close of evidence, violated his due process rights. We affirm the termination order.

FACTS

John Downs and Jacque Jones generated Jessie, born May 2, 2009. All three names are fictitious. The caption of the case christens Jessie as J.E.L.D. At the time of

Jessie's birth, Downs was thirty-seven or thirty-eight years of age, and Jones was eighteen years old.

John Downs previously fathered seven other children. All children were primarily raised by their respective mothers. The State terminated the rights of Downs to another of his children. Downs maintains a relationship with two daughters, whom Jessie visited on occasion. Before the birth of Jessie, John Downs had two convictions for burglary, one conviction for assault, and another conviction for attempting to elude a police officer.

For the first three years of Jessie's life, she resided with her mother and father. During this time, police journeyed to the residence on three occasions of domestic violence involving injuries to the mother, Jacque Jones. On each occasion, Jessie witnessed the violence or the aftermath of the violence. Jessie was never hit nor physically harmed. Jones stated that, on occasion, John Downs choked her and that she learned to pretend to lose consciousness so Downs would end the strangulation. Jones also reported Downs striking her, on one occasion, after which Jones pursued him with a baseball bat. Although Jones viewed Downs as a threat, she never expressed a desire to end the couple's relationship.

In January 2011, the State of Washington Department of Social and Health Services (DSHS) first received notice of concerns of domestic violence at the Downs-Jones home. DSHS first intervened in the care for Jessie, in June 2012, because of allegations of domestic violence by John Downs against Jacque Jones in the presence of

2

Jessie. DSHS assigned caseworker Jessica Strawn to Jessie's file.

In August 2012, John Downs pled guilty to assault in the fourth degree domestic violence for an attack on Jones. The trial court then entered a no contact order prohibiting Downs from contact with Jones.

In August 2012, Jessica Strawn visited Jacque Jones and Jessie at their house. Jessie spontaneously commented: "We saw Daddy at the park." Verbatim Tr. of Proceedings (VTP) at 70. The rendezvous at the park violated the court protective order.

In September 2012, DSHS removed Jessie from her home with Jacque Jones. On September 26, 2012, the State of Washington initiated dependency proceedings for Jessie. On November 8, 2012, the trial court entered a default order of dependency against John Downs.

John Downs disobeyed the order protecting Jacque Jones on more occasions. On October 8, 2012, the trial court convicted Downs of two counts of violation of the domestic violence no contact order and one count of felony witness tampering. Downs had instructed Jacque Jones not to appear at court for the domestic violence trial. A judge sentenced Downs to one year and one day of confinement, and Downs entered the Airway Heights Corrections Center. Downs may have earlier resided in the Kittitas County jail. Before entering prison, Downs did not contact the dependency case social worker, Jessica Strawn, for purposes of improving his parenting.

John Downs has not seen Jessie since his incarceration in October 2012. Social

worker Jessica Strawn deemed that Jessie's visiting her father in prison would not serve the girl's interest since prison looms as a traumatizing venue for visitation. Strawn claimed she possessed discretion to allow or disallow visitation between Downs and Jessie. Linnea Lauer, Jessie's therapist, recommended no visitation between Jessie and her father.

Jacque Jones abused unlawful drugs. She was evicted from her home in December 2012 for concerns over the use of methamphetamine.

On January 24, 2013, the trial court ordered John Downs to engage in the following services in order to remedy his parental deficiencies: (1) complete a drug and alcohol assessment and participate in any recommended treatment, (2) complete a parenting assessment and participate in any recommended counseling, (3) complete a psychological evaluation and comply with any recommended treatment, (4) complete a domestic violence/anger-management assessment and participate in any recommended classes, (5) provide releases of information, and (6) secure housing. The order also read: "[t]he father is incarcerated, [sic] upon his release and contact with the department [DSHS] a visitation plan will be developed and implemented." Ex. 3 at 5.

During incarceration at Airway Heights, John Downs called Jacque Jones numerous times. Downs' social worker, Jessica Strawn, informed the police of these violations of the protective order. The State prosecuted Downs for more violations of the protection order, and, in April of 2013, the trial court convicted and sentenced Downs to

an additional five years of confinement for five felony violations of the domestic violence no contact order.

DSHS provided Jessie with counseling by therapist Linnea Lauer during most of the dependency. Lauer received a master's degree in counseling and has provided counseling services since 1988. Lauer holds certifications in parental attachment, adoption, and foster care counseling.

Upon first seeing Jessie, Linnea Lauer assessed the mental health condition of the young girl and concluded she needed ongoing counseling as the result of violent scenes in her home. According to Lauer, the domestic violence between her father and mother traumatized Jessie and John Downs "represents something that was very frightening in [Jessie's] early childhood." VTP at 19.

Before therapy began in 2013, Jessie engaged in angry fits, during which she injured herself. Jessie at times needed separation from other children at her day care center. Jessie's condition improved as a result of counseling with Linnea Lauer. Lauer's services included meeting with the foster parents to assist them in developing skills needed to care for one with the background and behavior of Jessie.

By the time of the termination trial, Jessie still spoke of the violence in her home and retained an image of blood oozing from her mother's nose. As part of the therapy, Jessie dictated a letter to Lauer for her parents:

Dear [Jacque] and [John], this is [Jessie]. I want to tell you some things. I know you can't do that any more because that was bad stuff. You made me cry—when you made blood come out of your nose.

VTP at 21.

Because of John Downs' imprisonment, DSHS has not offered him any of the court ordered services. Downs, on his own initiative, sought services in the Airway Heights Corrections Center in an effort to satisfy the court order. He pursued a psychological evaluation through the mental health coordinator at the prison. The coordinator responded that the prison did not offer psychological evaluations.

John Downs has not receive parenting classes or domestic violence classes. Downs wanted to attend parenting and domestic violence classes ordered by the trial court, but Airway Heights Corrections Center did not offer these services.

A chemical dependency evaluation in prison found John Downs chemically dependent on methamphetamine. Beginning in June 2014, Downs participated in intensive day treatment at the Airway Heights Corrections Center for his chemical dependency, and this treatment included some anger management and parenting training. The treatment continued through the parental termination trial in October 2014. As part of the treatment, Downs underwent urinalyses, all of which reported negative for drug use. According to the chemical dependency counselor, Downs participated in treatment fittingly. In addition to chemical dependency treatment, Downs voluntarily attended alcoholics anonymous and narcotics anonymous meetings.

During incarceration, John Downs completed an anger and stress management class twice, and he finished choice therapy, during which he learned to make good choices. Downs also completed a "redemption x self awareness" class, which focused on moral recognition therapy. He completed a relationship works class, which included a domestic violence component.

## PROCEDURE

On November 21, 2013, the State of Washington petitioned to terminate Jacque Jones' and John Downs' respective parental rights to Jessie. On January 3, 2014, the trial court appointed Nancy Graham to serve as guardian ad litem for Jessie.

After the filing of the termination petition, John Downs' counsel asked social worker Jessica Strawn if Downs could correspond with Jessie, and Strawn approved. Downs did not send any letters, however.

On October 23, 2014, the trial court conducted a trial on the parental termination petition against John Downs and Jacque Jones. By then, Jessie had resided with maternal relatives, her third placement, for approximately one year. She was five years old.

John Downs testified on his behalf at trial. Downs insisted that he earlier actively parented Jessie. He claimed to be with Jessie constantly before his incarceration, but we assume that the no contact order interfered to some extent in interaction with Jessie immediately before the imprisonment. According to Downs, Jessie always called him "daddy." VTP at 133.

7

During trial, John Downs testified he always ran from fights with Jacque Jones. He admitted the two sometimes heatedly argued, but he never choked Jones. He also denied striking Jones. He conceded to once shoving Jones in the presence of Jessie. According to Downs, his only domestic violence charge resulted from pushing Jones away from the door so he could exit the house.

DSHS social worker Jessica Strawn testified at trial. Strawn stated that she never observed John Downs interact with Jessie, nor assessed his parenting skills, because he was incarcerated for the duration of Strawn's involvement in the case. Strawn averred at trial:

> I think it is—it's very concerning to me when a parent is aware that they not only have one child that requires parenting but multiple children that require parenting, and they still put themselves in the position to become incarcerated, they're still committing crimes for which they are convicted. And I really think that speaks volumes to a person's—empathy for their children, their willingness to be available for them, their physical ability to be available for them.

VTP at 108. Strawn testified that Downs' relationship with Jessie was chaotic given his history of incarceration and domestic violence against Jacque Jones.

Jessica Strawn testified that she knew that Airway Heights Corrections Center did not offer domestic violence evaluations and treatment and that she did not refer John Downs for any such evaluation. According to Strawn, DSHS does not send service providers to Airway Heights Corrections Center for domestic violence or mental health treatment and evaluations. John Downs testified that prisoners can be transported from

8

prison for an appointment. Strawn conceded that she did not know if Downs could be

transferred from prison for treatment, but she declared a belief that prisoners were only

transported for medical or court appointments. When asked at trial as to what services

DSHS offered Downs to remedy his parenting deficiencies, Strawn replied:

> encouraging him to do what DOC [Department of Corrections]
> offers and then letting him know for certain that we would expect him to
> do—treatment once he's out, or at least be reassessed and see what outside
> evaluators have to say.

VTP at 83.

Jessica Strawn testified that she applauded John Downs for engaging in services at

prison but informed him he would need to engage in the services again once released

from prison. Strawn did not wish Downs to be misled that prison services would lead to

being reunited with his daughter. According to Strawn, Downs must complete domestic

violence perpetrator's treatment upon release from prison. She explained that domestic

violence treatment differed in content and duration from the limited anger and stress

management counseling obtained by Downs in prison.

During Jessica Strawn's testimony, John Downs' counsel reasonably insinuated

that DSHS maintained the position that, if a parent goes to jail, the parent will lose rights

to his child. Strawn denied the insinuation and protested that DSHS assists incarcerated

parents in various circumstances. She mentioned no assistance provided John Downs.

Linnea Lauer, Jessie's therapist, testified during the trial. Lauer testified that

reunification of Jessie with her father could cause Jessie serious confusion, regression, and unhealthy coping strategies for stress. Lauer also testified that Jessie is forming a secure attachment to her foster parents. By the time of trial, Jessie maintained no relationship with her biological parents, and Lauer did not recommend forcing a relationship with either natural parent.

During trial, Linnea Lauer and Jessica Strawn testified to the importance of permanency in Jessie's life. John Downs requested a guardianship for Jessie until he could care for her. Jessica Strawn testified that a guardianship would not provide Jessie the safety and long-term support she needs. Strawn emphasized the attachment between Jessie and her foster family.

At trial, John Downs estimated his release date from prison to be July 2016. Social worker Jessica Strawn estimated that Downs would need a minimum of three years to remedy his parental deficiencies. The testimony is not clear as to whether the three years would commence on Downs' release from prison or the time of trial in October 2014. Strawn also testified that Jesse needed extensive therapy before contact with her father. Katrina Daily, John Downs' chemical dependency counselor, testified that Downs will need additional drug treatment upon release from prison.

Jessica Strawn testified that, on John Downs' release from prison, she would want Downs to undergo random urinalyses, submit to a domestic violence perpetrator's evaluation and engage in any recommended domestic violence therapy, submit to a

psychological evaluation with a parenting component and engage in any recommended therapy and training, and undergo stress and anger-management classes. According to Strawn, a domestic violence treatment program would last six months or longer. Strawn emphasized John Downs' history of domestic violence against many women over twenty years. Strawn insisted that Downs needed additional anger-management classes, despite taking classes in prison, because the prison instruction did not address Downs' historical pattern of violent abuse and his relationship with his daughter. Strawn later testified to the contrary and stated Downs might not need additional anger-management classes.

John Downs testified that he did not believe he could immediately enter Jessie's life upon his release from prison. Instead, he conceded he would need further training and monitoring, after freedom from incarceration, in order to care for Jessie. Among other services, he agreed he needed domestic violence classes. When asked when he would be ready to parent Jessie, Downs gave no direct answer.

At trial, Jessica Strawn testified to statements made by Jacque Jones and the testimony elicited a ruling by the trial court:

> [Strawn]: . . . [Jones] shared an incident when she was very young, when [Jessie] was a baby, that [Downs] had asked to meet with her and with—and see [Jessie], and at one point he was outside the car—he had convinced her to let him hold [Jessie]—he was yelling at her, screaming at her, and she was really concerned for [Jessie's] safety.
>
> . . . .
>
> THE COURT: Ms. Busha, just so you know, I'm only going to consider that . . . insofar as it relates to the mom's . . . situation—and it's hearsay . . . towards the dad.

11

. . . .

[Strawn]: —that he would choke her and that she had learned how to essentially pretend to pass out so that he would stop strangling her. . .

VTP at 75-76.

On February 13, 2014, guardian ad litem Nancy Graham reported to the court that Jessie thrived with her foster parents and that she recommended termination of both parents' rights. On April 10, 2014, Graham reported to the court again. She recommended that Jessie remain in the care of her foster parents. Graham did not sign either guardian ad litem report under oath.

Guardian ad litem Nancy Graham did not testify at the termination trial, but she periodically asked witnesses questions. Following the close of evidence, Graham delivered a short closing argument. Graham asked the trial court to terminate the parental rights of Jacque Jones and John Downs so that Jessie might be released for adoption. During her closing comments, guardian ad litem Nancy Graham repeated some hearsay statements, including a comment by Jessie that she is "still a little fearful sometimes." VTP at 148. John Downs' attorney delivered her closing argument after the guardian ad litem's statement to the trial court.

The trial court terminated John Downs' and Jacque Jones' respective parental rights to Jessie. The trial court entered the following findings of fact:

> 1.10 All services ordered under RCW 13.34.136 have been offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been

12

offered or provided to the parents in an express and understandable manner, including but not limited to the following:

. . . .

The father was offered the services that were available to him in custody, including stress management classes and chemical dependency services. He is in need of random UAs and any recommended chemical dependency services, a psychological assessment with parenting component, and a domestic violence perpetrator's assessment and recommended treatment. These services were unavailable during the dependency, due to the father's incarceration for five felony violations of a domestic violence protection order. The father was aware of this service plan and agreed that he needed these services, but they were unavailable in his facility.

. . . .

1.11 The father has failed to remedy his parental deficiencies. He is currently serving a five year sentence for five felony violations of a domestic violence protection order. He anticipates his early release date will be in July of 2016. The father violated the domestic violence protection order by choosing to have contact with the mother. He knew that contacting her was a violation of the order, but chose to contact her anyway. The father has eight children and does not currently parent any of them due to separations with their mothers and his current incarceration. His rights were previously terminated in regards to his fourth child, [S.]. The father believed the termination of parental rights was due to his incarceration at the time for drug use and second degree burglary. In 2012, he was also convicted of two additional violations of domestic violence protection orders and felony witness tampering. The father has nine felony convictions total, and a conviction for assault against the mother. [Jessie] witnessed this assault. The father has been diagnosed as chemically dependent. The father has participated in the same stress and anger management class while in custody twice, and intends to participate in it again. The father also participated in chemical dependency services and is currently in compliance with his program. The father needs to engage in a domestic violence perpetrator's assessment and complete the recommended treatment. He has not done so, due to his incarceration and the unavailability of that service at Airway Heights Correctional Facility. The father needs to engage in a psychological evaluation with a parenting component, but has not done so, as this service is also unavailable to the father in custody.

13

1.12 The father has not maintained a meaningful role in the child's life. Throughout the dependency, the father was incarcerated and unavailable for visitation with the child. Visitation was restricted during the dependency due to the recommendations of the child's therapist that contact or visitation would be harmful. This harm is based upon violent scenes the child had witnessed between the parents and emotional and behavioral issues that have not yet been fully resolved therapeutically. Visitation or contact with the father would be retraumatizing to [Jessie] based upon the violence and separation she has experienced. The father maintained minimal contact with the social worker during the dependency process; he participated in one Family Team Decision Making Meeting in 2012 and provided the social worker with a certificate.

1.12 [sic] There is little likelihood that conditions will be remedied so that the child can be returned to either or both of her parents in the near future. Neither parent has successfully remedied the deficiencies which led to the filing of the dependency petition. The father will remain incarcerated until at least July of 2016 and the services which are necessary to resolve his domestic violence and parenting issues are not available while he is in custody. . . . There is no indication that the child could be returned to either parent, and contact with the parents would be harmful to the child. [Jessie] has been waiting for permanency since the dependency case began in 2012, and she can no longer wait to have a permanent and stable home.

1.13 The mother and father are currently unfit to parent. . . . The father has a long standing history of criminal involvement and incarceration, including a long history of violence against various partners. He has 8 children and is not currently parenting any of them. The father is unable to provide a home or the skills necessary to adequately parent [Jessie] now or in the near future.

1.14 Continuation of the parent-child relationship clearly diminishes the child's prospects for integration into a stable and permanent home. At age 5 years, [Jessie] will be more easily integrated into a new family unit now than if the process is further delayed. The child has no current bonding to the mother or father. No permanent setting can be established until the parents' rights have been terminated. [Jessie] is in need of a permanent setting which the mother and father are unable to provide at this time. The child has been in therapy throughout the dependency and is currently working on bonding with her current placement. She has been in multiple placements, including residing with her mother, a foster home and her current relative placement. These changes in placement impact her

14

ability to attach, requiring at least six months for each change of placement, and she need to establish permanency at this time.

1.15 Based upon the foregoing findings of fact, termination of parental rights is in [Jessie's] best interests. The mother and father have demonstrated that they are incapable of providing or unwilling to provide a healthy and stable environment for [Jessie ] due to their failure to resolve the ongoing domestic violence issues, chemical dependency, and the lack of a relationship or bond with the child. Neither parent has stable housing or the ability to take physical responsibility for the child and do not have the parenting skills to meet her needs. Termination of parental rights rather than a guardianship is in [Jessie's] best interest. If contact with the parents were forced upon [Jessie], she would regress and not have the coping skills that she has now. There is no potential guardian available and contact with the parents would be harmful to the child.

1.16 The guardian ad litem recommends that the parent-child relationship be terminated.

CP at 102-06.

From these findings of fact, the trial court concluded:

2.5 All services ordered under RCW 13.34.136 and all necessary and reasonably available services capable of correcting parental deficiencies within the forseeable future have been offered or provided in an express and understandable manner.

2.6 There is little likelihood that conditions will be remedied so that the child could be returned to either or both of her parents in the near future.

2.7 Continuation of the parent-child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

2.8 It is in the best interest of the child that the parent-child relationship be terminated.

2.9 All elements of RCW 13.34.180 have been established by clear, cogent and convincing evidence.

CP at 107.

No. 32941-1-III
*In re the Dependency of J.E.L.D.*

LAW AND ANALYSIS

On appeal, John Downs raises many contentions. Downs contends the trial court permitted an inadmissible hearsay statement. He contends that the guardian ad litem's comments to the trial court violated his due process rights because the guardian testified without being under oath and without Downs being afforded the opportunity to cross-examine her. Downs argues that insufficient evidence supports findings that DSHS provided all necessary services, that there was little likelihood that he could remedy his parental deficiencies in the near future, that a relationship between his daughter and him diminished Jessie's prospects for integration into a stable and permanent home, that he was an unfit parent, and that termination of parental rights served Jessie's best interests. Finally, Downs argues that the trial court failed to consider the "incarcerated parent factors" enumerated in RCW 13.34.180(1)(f). We address the contentions in such order. Downs' many arguments prolong this opinion.

Hearsay

Before addressing the merits of John Downs' appeal, we address two evidentiary questions. As a preliminary matter, Downs argues that the trial court impermissibly heard and considered hearsay testimony of Jessica Strawn, during which Strawn repeated statements of Jacque Jones, the mother.

16

John Downs' contention fails to recognize that the mother of Jessie was also a party to the termination proceeding. The trial court ruled that it would consider the hearsay when resolving the termination of the mother's rights, but not consider the testimony when resolving termination of Downs' parental rights. We recognize that the hearsay testimony implicated Downs more than Jones, since the testimony concerned an incident of rage by Downs. Nevertheless, the testimony could show Jones' deficient parenting by failing to protect Jessie from Downs. The record does not contradict the judge's ruling that he would consider the evidence only against the mother.

Hearsay is an out of court statement offered for the truth of the matter asserted. ER 801. Hearsay is generally not admissible. ER 802. However, ER 801 excludes from the definition of hearsay admissions of a party-opponent. ER 801(d)(2) excepts from the hearsay rule a statement "offered against a party and is (i) the party's own statement, in either an individual or representative capacity." Therefore, Jacque Jones' statements could be admitted against her as statutory nonhearsay.

### Guardian Ad Litem

John Downs contends that the trial court breached his due process rights when allowing the guardian ad litem to give unsworn, hearsay testimony during a closing statement. We note that Downs does not object to the trial court's receipt of the guardian ad litem's report without the report being under oath. We reject Downs' assignment of error.

17

We readily agree that John Downs deserves due process before termination of his parental rights. The State cannot deprive a person of life, liberty, or property without due process of law. U.S. CONST. amend. XIV, § 1; WASH. CONST. art. I, § 3. Parents have a fundamental liberty interest in the care, custody, and control of their children. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). Therefore, at hearings to terminate parental rights, a parent is entitled to due process of law. *In re Welfare of Luscier*, 84 Wn.2d 135, 137, 524 P.2d 906 (1974). There can be no doubt that the full panoply of due process safeguards applies to deprivation hearings. *Luscier*, 84 Wn.2d at 137.

We address the role of a guardian ad litem in a parental termination case and the purpose of a witness oath in litigation before returning to the constitutional issue raised. A court rule and a statute impose overlapping duties on a guardian ad litem in a parental termination suit. RCW 13.34.105 reads, in pertinent part:

> (1) Unless otherwise directed by the court, the duties of the guardian ad litem for a child subject to a proceeding under this chapter, including an attorney specifically appointed by the court to serve as a guardian ad litem, include but are not limited to the following:
> (a) To investigate, collect relevant information about the child's situation, and report to the court factual information regarding the best interests of the child;
> (b) To meet with, interview, or observe the child, depending on the child's age and developmental status, and report to the court any views or positions expressed by the child on issues pending before the court;
> . . . .
> (e) Court-appointed special advocates and guardians ad litem may make recommendations based upon an independent investigation regarding

18

the best interests of the child, which the court may consider and weigh in conjunction with the recommendations of all of the parties;

(f) To represent and be an advocate for the best interests of the child;

. . . .

(2) A guardian ad litem shall be deemed an officer of the court for the purpose of immunity from civil liability.

GALR 2 echoes and supplements RCW 13.34.105. The massive court rule

declares, in relevant portion:

Consistent with the responsibilities set forth in Titles 11, 13, and 26 of the Revised Code of Washington and other applicable statutes and rules of court, in every case in which a guardian ad litem is appointed, the guardian ad litem shall perform the responsibilities set forth below. For purposes of these rules, a guardian ad litem is any person who is appointed by the court to represent the best interest of the child(ren). . . .

(a) **Represent best interests.** A guardian ad litem shall represent the best interests of the person for whom he or she is appointed. Representation of best interests may be inconsistent with the wishes of the person whose interest the guardian ad litem represents. The guardian ad litem shall not advocate on behalf of or advise any party so as to create in the mind of a reasonable person the appearance of representing that party as an attorney.

(b) **Maintain independence.** A guardian ad litem shall maintain independence, objectivity and the appearance of fairness in dealings with parties and professionals, both in and out of the courtroom.

(c) **Professional conduct.** A guardian ad litem shall maintain the ethical principles of the rules of conduct set forth in these rules and is subject to discipline under local rules established pursuant to rule 7 for violation.

(d) **Remain qualified for the registry.** Unless excepted by statute or court rule, a guardian ad litem shall satisfy all training requirements and continuing education requirements developed for Titles 13 and 26 RCW guardians ad litem by the administrator of the courts and for Title 11 RCW guardians ad litem as required by statute and maintain qualifications to serve as guardian ad litem in every county where the guardian ad litem is

19

listed on the registry for that county and in which the guardian ad litem serves and shall promptly advise each such court of any grounds for disqualification or unavailability to serve.

**(e) Avoid conflicts of interests.** A guardian ad litem shall avoid any actual or apparent conflict of interest or impropriety in the performance of guardian ad litem responsibilities. . . .

**(f) Treat parties with respect.** A guardian ad litem is an officer of the court and as such shall at all times treat the parties with respect, courtesy, fairness and good faith.

**(g) Become informed about case.** A guardian ad litem shall make reasonable efforts to become informed about the facts of the case and to contact all parties. A guardian ad litem shall examine material information and sources of information, taking into account the positions of the parties.

**(h) Make requests for evaluations to court.** A guardian ad litem shall not require any evaluations or tests of the parties except as authorized by statute or court order issued following notice and opportunity to be heard.

**(i) Timely inform the court of relevant information.** A guardian ad litem shall file a written report with the court and the parties as required by law or court order or in any event not later than 10 days prior to a hearing for which a report is required. The report shall be accompanied by a written list of documents considered or called to the attention of the guardian ad litem and persons interviewed during the course of the investigation.

**(j) Limit duties to those ordered by court.** A guardian ad litem shall comply with the court's instructions as set out in the order appointing a guardian ad litem, and shall not provide or require services beyond the scope of the court's instruction unless by motion and on adequate notice to the parties, a guardian ad litem obtains additional instruction, clarification or expansion of the scope of such appointment.

. . . .

**(l) Appear at hearings.** The guardian ad litem shall be given notice of all hearings and proceedings. A guardian ad litem shall appear at any hearing for which the duties of a guardian ad litem or any issues substantially within a guardian ad litem's duties and scope of appointment are to be addressed. . . .

. . . .

**(o) Perform duties in timely manner.** A guardian ad litem shall perform responsibilities in a prompt and timely manner, and, if necessary,

request timely court reviews and judicial intervention in writing with notice to parties or affected agencies.

**(p) Maintain documentation.** A guardian ad litem shall maintain documentation to substantiate recommendations and conclusions and shall keep records of actions taken by the guardian ad litem. . . .

**(q) Keep records of time and expenses.** A guardian ad litem shall keep accurate records of the time spent, services rendered, and expenses incurred in each case and file an itemized statement and accounting with the court and provide a copy to each party or other entity responsible for payment. The court shall make provisions for fees and expenses pursuant to statute in the Order Appointing Guardian ad Litem or in any subsequent order.

Based on his or her duties found in statute and court rule, a guardian ad litem is unlike other witnesses at trial. The Washington Legislature, by RCW 13.34.105(2), deems a guardian ad litem an officer of the court entitled to immunity from civil liability. *Kelley v. Pierce County*, 179 Wn. App. 566, 575, 319 P.3d 74, *review denied*, 180 Wn.2d 1019, 327 P.3d 55 (2014). A guardian ad litem is entitled to quasi-judicial immunity because the guardian performs judicial-like functions. *Kelley v. Pierce County*, 179 Wn. App. at 573-75. A guardian ad litem is "an arm of the court." *Barr v. Day*, 124 Wn.2d 318, 332, 879 P.2d 912 (1994).

The Washington Constitution addresses witness oaths. WASH. CONST. art. I, § 6 declares:

The mode of administering an oath, or affirmation, shall be such as may be most consistent with and binding upon the conscience of the person to whom such oath, or affirmation, may be administered.

21

The Washington Supreme Court implemented the constitutional directive with an evidence rule:

> Before testifying, every witness shall be required to declare that the witness will testify truthfully, by oath or affirmation administered in a form calculated to awaken the witness' conscience and impress the witness' mind with the duty to do so.

ER 603. We do not address whether a guardian ad litem constitutes a "witness" or whether a guardian ad litem's report or closing statement constitutes "testimony" for purposes of ER 603.

*State v. Dixon*, 37 Wn. App. 867, 684 P.2d 725 (1984), informs us of the purpose behind an oath or affirmation of a testifying witness. The State charged Michael Dixon with indecent liberties. The State called eight-year-old Breckeen Anderson to testify at trial, but the trial court, contrary to the State's request, did not administer an oath to the lad. The prosecutor asked a series of questions to establish that Breckeen knew the difference between the truth and a lie and recognized the importance of telling the truth. Breckeen promised to tell the truth. Breckeen then told the jury that he heard someone screaming near the time that the victim claimed Dixon assaulted her.

On appeal, Steve Dixon sought reversal of his conviction on the ground that the trial court failed to administer a witness oath to Breckeen Anderson as demanded by ER 603. The *Dixon* court noted that, under earlier case law, there was no need to administer a formal oath or affirmation to a child of tender years. The court observed that the

22

purpose of an oath or affirmation is to awaken the witness' conscience and impress his mind with the duty to tell the truth. The court concluded that questioning and directions to Breckeen Anderson, before he testified to his observations, awakened his conscience to the duty to speak honestly. The *Dixon* court also held that Dixon waived any irregularity by failing to object to the testimony, without an oath, of young Breckeen.

As already discussed, a guardian ad litem is an officer of the court who holds duties not possessed by other witnesses. John Downs does not claim that guardian ad litem Nancy Graham violated any of her statutory or rulatory obligations. The fact alone of being an officer of the court quickens the guardian's conscience to report truthfully to the court. Most guardians ad litem maintain an ongoing relationship with his or her local court judges. The guardian engages in continual training. These factors add further safeguards to a guardian ad litem reporting honestly.

A relevant decision is *In re Welfare of S.V.B.*, 75 Wn. App. 762, 88 P.2d 80 (1994). The father, in a parental termination case, complained on appeal that the guardian ad litem gave an oral report, while not under oath, after the close of evidence. The father objected to any purported evidence being argued for the first time in closing statements, but did not seek to cross-examine the guardian under oath. The guardian ad litem reported that the children needed permanence that could only be achieved by termination. This court held that the trial court committed no error by entertaining the guardian ad litem's oral report at the close of testimony. In a terse analysis the court

23

held:

> The law provides for the appointment of a guardian ad litem and for a report from the guardian to the court. Former RCW 13.34.100; see RCW 13.34.105. Clearly, it also permits the juvenile court to consider the guardian's report. There is no requirement that the guardian make his report under oath. However, if Appellant had desired to call the guardian as a witness, he could have done so. Then it would have been appropriate for the court to administer the oath. The trial court did not err in considering the report of the guardian ad litem.

*In re S.V.B.*, 75 Wn. App. at 767-68.

*S.V.B.* did not address the due process contention that John Downs raises. The court only engaged in statutory interpretation. Nonetheless, we note that, in *S.V.B.*, the father objected to the closing argument of the guardian ad litem. John Downs did not object to the closing statement of his child's guardian ad litem, let alone seek to cross-examine the guardian ad litem. Guardian ad litem Nancy Graham's comments in closing did not differ from her recommendations already provided in her written report.

John Downs principally relies on *In re Welfare of Ross*, 45 Wn.2d 654, 277 P.2d 335 (1954), in which the State terminated the parental rights of a father. The State introduced into evidence his wife's cross complaint in a divorce action pending against the father. The decision does not describe the allegations contained in the cross complaint, but apparently the accusations impugned the father's parenting skills. The State did not call the wife to testify at trial. The State Supreme Court reversed the termination because the cross complaint constituted testimony from a witness not sworn

24

to truthfully testify. *Ross* is quickly distinguishable because the unsworn witness was not a guardian ad litem, but presumably an unsympathetic wife.

We hold for numerous reasons already contoured that the trial court did not breach John Downs' due process rights when permitting guardian ad litem Nancy Graham to deliver a short closing statement without being administered an oath. Graham knew from factors, other than an affirmation, the importance of speaking honestly. Downs could have cross-examined Graham if he wished. The closing statement provided no evidence or recommendations not already known by Downs. Downs forwards no decision that demands a guardian ad litem's written or oral report be given under oath.

### Necessary Services

We now turn from evidentiary assignments of error and begin a discussion of John Downs' insufficiency of evidence arguments. Downs contends the evidence did not support many of the statutory elements the State must prove before terminating a parent's rights.

On appellate review, the trial court's findings in a parental rights termination proceeding must be affirmed if supported by substantial evidence from which a rational trier of fact could find the necessary facts by clear, cogent and convincing evidence. *In re Dependency of K.S.C.*, 137 Wn.2d 918, 925, 976 P.2d 113 (1999). Whether substantial evidence exists to support the superior court's findings is measured in light of the "highly probable" test. *See In re Welfare of Carpenter*, 21 Wn. App. 814, 816, 587

P.2d 588 (1978). Under that test, the evidence must be more substantial than in the ordinary civil case in which proof need only be by a preponderance of the evidence. *In re Welfare of Hall*, 99 Wn.2d 842, 849, 664 P.2d 1245 (1983). The evidence establishes a "high probability" when permanent deprivation is necessary for the physical and mental welfare of the child. *Carpenter*, 21 Wn. App. at 816. Appellate courts "defer to the trial court's credibility determinations when reviewing an order terminating parental rights." *In re Dependency of A.M.M.*, 182 Wn. App. 776, 786, 332 P.3d 500 (2014).

We list all statutory elements before addressing whether the evidence supports discrete elements. Before terminating a person's right to parent his child, the State must prove six parental inadequacy elements by clear, cogent, and convincing evidence:

> (a) That the child has been found to be a dependent child;
> (b) That the court has entered a dispositional order . . .
> (c) That the child has been removed . . . from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future . . .
> (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. If the parent is incarcerated, the court shall consider whether a parent maintains a meaningful role in his or her child's life based on factors identified in RCW 13.34.145(5)(b); whether the department or supervising agency made reasonable efforts as defined in this chapter; and whether particular barriers existed as described in RCW 13.34.145(5)(b)

26

including, but not limited to, delays or barriers experienced in keeping the agency apprised of his or her location and in accessing visitation or other meaningful contact with the child.

RCW 13.34.180(1) (emphasis added).

Once the State proves the initial six elements by clear, cogent, and convincing evidence, the trial court concentrates on whether termination is in the child's best interests. *In re A.M.M.*, 182 Wn. App. at 784-85. The State must prove that termination is in the best interests of the child by a preponderance of the evidence. *In re A.M.M.*, 182 Wn. App. at 784.

John Downs argues that this court should ignore unsupported factual statements, in the form of arguments, forwarded by the State in its brief. Specifically, Downs complains that the State asserts that Jessie is afraid of him and that Jessie has special parenting needs. Nevertheless, Linnea Lauer, Jessie's therapist, testified that Downs frightened Jessie. Lauer also testified to Jessie's needs because of her background and behavior and that she assisted Jessie's foster parents in addressing these needs. Therefore, trial evidence reasonably supports the arguments of the State.

John Downs contends that insufficient evidence supports the trial court's findings that the State met its burden to prove the first three elements of RCW 13.34.180 by clear cogent, and convincing evidence. Those elements are: (1) the child has been found to be a dependent child, (2) the court has entered a dispositional order, and (3) the child has been removed from the custody of the parent for a period of at least six months pursuant

27

to a finding of dependency. Nevertheless, Downs includes no argument in his brief about a lack of evidence for these elements. When a party assigns error, but does not argue it, the error is deemed waived. *Fulton v. Fulton*, 57 Wn.2d 331, 336, 357 P.2d 169 (1960); *Erdman v. Henderson*, 50 Wn.2d 296, 298, 311 P.2d 423 (1957). We do not address whether evidence supported the first three of the six elements in RCW 13.34.180(1). We move to the fourth of the six elements.

John Downs contends that the State failed to prove that it offered and provided all services that the court ordered him to complete. Under RCW 13.34.180(1)(d), the State must expressly offer or provide all services ordered by the trial court. The State must also provide or offer necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future. "Necessary services" are those services needed for the parent to reunite with his or her child. *In re Welfare of C.S.*, 168 Wn.2d 51, 56 n.3, 225 P.3d 953 (2010); *In re Dependency of D.L.B.*, 188 Wn. App. 905, 920, 355 P.3d 345 (2015). "Reasonably available" encompasses all reasonable services that are available within the agency, or within the community, or those services which the department has existing contracts to purchase in order to enable a parent to resume custody. *In re Dependency of T.L.G.*, 126 Wn. App. 181, 198, 108 P.3d 156 (2005). The State must tailor the services it offers to meet each individual parent's needs. *In re Welfare of S.J.*, 162 Wn. App. 873, 881, 256 P.3d 470 (2011).

The trial court ordered six services for John Downs:

28

(1) completion of a drug and alcohol assessment and participation in any recommended treatment;

(2) completion of a parenting assessment and participation in any recommended counseling;

(3) completion of a psychological evaluation and compliance with any recommended treatment;

(4) completion of a domestic violence/anger-management assessment and participation in any recommended classes;

(5) provision of releases of information; and

(6) securing of housing.

The last two ordered services did not demand any assistance from DSHS. We do not know if Downs provided the court or the State all needed releases for information. Downs did not secure housing for Jessie, but instead gained secure housing for himself from the state Department of Corrections. Our analysis of the sufficiency of evidence does not focus on the last two ordered services.

Jessica Strawn impliedly, if not expressly, testified that the State would require John Downs to satisfy the first four of the court ordered services before regaining custody of Jessie. Thus, we consider those services necessary in addition to being ordered by the trial court. The uncontroverted evidence established that John Downs underwent a chemical dependency assessment, which found him dependent on methamphetamine.

Thereafter, Downs engaged in the intensive chemical dependency treatment offered by Airway Heights Corrections Center. The State's evidence equivocates as to whether the chemical dependency treatment received by Downs in prison suffices for the court order. Regardless, the State never offered Downs the dependency treatment it may now demand Downs undergo to comply with the court order.

The State did not offer John Downs a parenting assessment or parenting classes. The State did not offer Downs psychological evaluation or counseling. The State did not offer Downs a domestic violence or anger assessment or domestic violence or anger-management training. Downs tried to obtain all of these assessments and services, but they were not available in prison. According to Jessica Strawn, Downs had limited parenting and anger-management classes at Airway Heights Corrections Center, but the limited nature of the programs did not suffice to meet the State requirements to parent Jessie. Strawn emphasized the need of Downs to undergo extensive domestic violence counseling because of his history.

Social worker Jessica Strawn testified that she did not attempt to offer or provide John Downs with services ordered by the court because DSHS does not send service providers into Airway Heights Correctional Facility to provide domestic violence services. Since the trial court entered the order for services three months after Downs entered the correctional center, one wonders why the State presented or agreed to the order and why the State never later informed the court that it would not follow the order.

30

Downs contends that prisoners might be transported from Airway Heights for services. Strawn stated a belief that transportation was not available, but she never investigated the validity of her belief.

The State used John Downs' incarceration as an insurmountable wall keeping him from his daughter. The State mandated services for him to retain rights to companionship with Jessie, then the State argues that it need not deliver the services because they are not reasonably available. The State violated the spirit, if not the letter, of RCW 13.34.180(1)(d) when demanding Downs complete a service, but not affording him an opportunity to engage in the service. This conclusion does not end our analysis, however.

The State need not offer services when a parent is unable to benefit from the services. *In re Welfare of S.J.*, 162 Wn. App. at 881 (2011). Even when DSHS "inexcusably fails" to offer services to a willing parent, termination will still be deemed appropriate if the services would not remedy the parent's deficiencies in the foreseeable future, which depends on the age of the child. *In re Dependency of T.R.*, 108 Wn. App. 149, 164, 29 P.3d 1275 (2001). When the record establishes that the offer of services would be futile, the trial court can find that the State offered all reasonable services. *In re Welfare of M.R.H.*, 145 Wn. App. 10, 25, 188 P.3d 510 (2008); *In re Welfare of Ferguson*, 32 Wn. App. 865, 869-70, 650 P.2d 1118 (1982), *rev'd on other grounds*, 98 Wn.2d 589, 656 P.2d 503 (1983).

31

Sufficient evidence supports a conclusion that provision of domestic violence and mental health services would have been futile. Even with treatment, John Downs, as of the trial, would remain in prison for almost two more years. Downs testified he would wish additional assistance after release from prison before caring for Jessie. Experts did not wish Jessie to visit Downs in prison in the meantime because of potential trauma resulting from a prison visit. At trial, Jessie was five years old and had not seen her father for two years. She was thriving with foster parents who might adopt her. From the perspective of Jessie, an additional three or more years to reunite with her father is not in the foreseeable future.

## Likelihood of Deficiency Remedy

The fifth of the six initial elements for the State to prove is "there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." RCW 13.34.180(1)(e). John Downs contends insufficient evidence supports this additional element of parental termination.

The focus of RCW 13.34.180(1)(e) is "whether the identified deficiencies have been corrected." *In re Welfare of M.R.H.*, 145 Wn. App. at 27 (2008). Even when evidence suggests that the parent may eventually correct parental deficiencies, termination is still appropriate when deficiencies will not be corrected within the foreseeable future. *In re A.W.*, 53 Wn. App. 22, 32, 765 P.2d 307 (1988). The State need not give a parent an unlimited time to become a fit parent. *In re Dependency of T.R.*, 108

32

Wn. App. at 167 (2001). When it is eventually possible, but not imminent, for a parent to be reunited with a child, the child's present need for stability and permanence is more important and can justify termination. *T.R.*, 108 Wn. App. at 166.

"Near future" is a key phrase in RCW 13.34.180(1)(e) and is determined from the child's point of view. *In re Dependency of A.C.*, 123 Wn. App. 244, 249, 98 P.3d 89 (2004). What constitutes "near future" depends on the age of the child and the circumstances of the child's placement. *T.L.G.*, 126 Wn. App. at 205. The cases support the proposition that the younger the child, the shorter is the "near future." "A matter of months for young children is not within the foreseeable future to determine if there is sufficient time for a parent to remedy his or her parental deficiency." *In re Welfare of M.R.H.*, 145 Wn. App. at 28 (2008). Eight months was not in the foreseeable future of a four-year-old. *Hall*, 99 Wn.2d at 850-51. One year was not in the foreseeable future of a three year-old. *In re A.W.*, 53 Wn. App. at 31-33 (1988). Six months was not foreseeable in the near future of a fifteen-month-old. *In re Dependency of P.D.*, 58 Wn. App. 18, 27, 792 P.2d 159 (1990).

Jessica Strawn estimated that John Downs needed at least three years to remedy his parental deficiencies. In analyzing Strawn's testimony, we consider that some of this time span results from a failure of the State to provide Downs ordered services. Nevertheless, Downs testified that at the earliest he would not be released until nearly two years after trial. He would then need additional time before reuniting with Jessie.

He could not estimate the period of time needed. We assume that any reunification would require at a minimum three years from the date of trial.

Our analysis here repeats our prior futility analysis. At trial, Jessie was five years old and had not seen her father for two years. She was thriving with foster parents who might adopt her. From the perspective of Jessie, an additional three or more years to reunite with her father is not in the foreseeable future. We cannot even be assured that services would allow Downs to surmount his history of domestic violence and overcome his parental deficiencies.

### Integration into Permanent Home

The final of the six initial elements of parental termination is "continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home." RCW 13.34.180(1)(f). We reject John Downs' contention that insufficient evidence supports this element. To the contrary, overwhelming, if not undisputed evidence supports the trial court's finding of diminished prospects. Jessica Strawn testified that maintaining Downs' parental rights would prevent Jessie from adoption and permanency. Jessie thrives now in a foster home that might adopt her. Strawn opined that Jessie needed security to continue to heal. A guardianship would not provide the permanency that Jessie needs. Linnea Lauer, the child's therapist, testified that Jessie had no current relationship with her father and that it would be confusing for her to attempt to establish one now.

34

Parental Unfitness

The six elements of parental termination cases, found in RCW 13.34.180 and .190, address, in part, whether a parent is unfit, but the elements are not conclusive or exclusive. Even if the State establishes the termination factors in RCW 13.34.180(1), the trial court may not terminate the rights of a currently fit parent. *In re Welfare of A.B.*, 168 Wn.2d 908, 919-20, 232 P.3d 1104 (2010); *In re Welfare of A.G.*, 160 Wn. App. 841, 845, 248 P.3d 611 (2011); *In re Welfare of Shantay C.J.*, 121 Wn. App. 926, 936, 91 P.3d 909 (2004); *Santosky*, 455 U.S. at 760. Termination of the parent-child relationship must be based on *current* parental unfitness. *In re Dependency of T.L.G.*, 126 Wn. App. at 203 (2005). Identifying parenting deficiencies is not the equivalent of proving parental unfitness. *In re Dependency of Schermer*, 161 Wn.2d 927, 943, 169 P.3d 452 (2007).

A finding of current unfitness requires more than the determination that DSHS proved, by a preponderance of the evidence, that a parenting deficiency exists, as in a dependency proceeding. *In re Welfare of A.B.*, 181 Wn. App. 45, 61, 323 P.3d 1062 (2014). To meet its burden to prove current unfitness in a termination proceeding, the State must prove that the parent's parenting deficiencies prevent the parent from providing the child basic nurture, health, or safety by clear, cogent, and convincing evidence. *A.B.*, 181 Wn. App. at 61.

John Downs maintains that insufficient evidence supports the trial court's finding that he was an unfit parent. We disagree. Substantial evidence supports this finding.

35

Jessica Strawn testified that Downs' prior relationship with Jessie was chaotic at best. Downs has been incarcerated for the majority of his daughter's life due to acts of domestic violence against her mother, including at least one assault occurring in front of Jessie. Linnea Lauer testified that Downs' abuse of Jacque Jones traumatized Jessie and that seeing Downs could cause regression and confusion for Jessie. Downs repeatedly violated a court order, which led to a lengthier sentence and precluded him from contact with his daughter. Downs fathered seven other children, all of whom were raised by their mothers. The State terminated Downs' rights to another child.

### Best Interests of Child

Termination is a two-step process. First, the court must find that the parent is unfit, and then it must find by a preponderance of the evidence that termination is in the best interests of the child. *In re Dependency of A.M.M.*, 182 Wn. App. at 784-85 (2014). The best interests of the child test is based on all of the facts and circumstances. *In re Dependency of A.V.D.*, 62 Wn. App. 562, 572, 815 P.2d 277 (1991).

John Downs also challenges the finding of termination being in Jessie's best interests. Overwhelming evidence, which we have previously reviewed, supports the finding.

### Incarceration

Three statutes direct the State to consider or engage in additional steps when a parent of a dependent child is incarcerated. John Downs advances each statute. We

36

conclude that none of the statutory provisions preclude the termination of Downs' parental rights.

The first statute is RCW 13.34.136(2)(b)(i)(A), which reads:

> If the parent is incarcerated, the plan must address how the parent will participate in the case conference and permanency planning meetings and, where possible, must include treatment that reflects the resources available at the facility where the parent is confined. The plan must provide for visitation opportunities, unless visitation is not in the best interests of the child.

RCW 13.34.136 addresses a permanency plan of care for a dependent child. Therefore, the statute lacks relevance in a termination proceeding. If Downs considered the State to have violated the statute, he should have raised the violation during the dependency proceeding. In *In re Welfare of M.R.H.*, 145 Wn. App. 10, 188 P.3d 510 (2008), we noted that a parent's complaint that the State failed to afford her visitation related back to the dependency proceeding.

The second statute, RCW 13.34.145 declares, in pertinent part:

> (5) Following this inquiry, at the permanency planning hearing, the court shall order the department or supervising agency to file a petition seeking termination of parental rights if the child has been in out-of-home care for fifteen of the last twenty-two months since the date the dependency petition was filed unless the court makes a good cause exception as to why the filing of a termination of parental rights petition is not appropriate. Any good cause finding shall be reviewed at all subsequent hearings pertaining to the child.
> (a) For purposes of this subsection, "good cause exception" includes but is not limited to the following:
> . . . .

(iv) The parent is incarcerated, or the parent's prior incarceration is a significant factor in why the child has been in foster care for fifteen of the last twenty-two months, the parent maintains a meaningful role in the child's life, and the department has not documented another reason why it would be otherwise appropriate to file a petition pursuant to this section;

. . . .

(b) The court's assessment of whether a parent who is incarcerated maintains a meaningful role in the child's life may include consideration of the following:

(i) The parent's expressions or acts of manifesting concern for the child, such as letters, telephone calls, visits, and other forms of communication with the child;

(ii) The parent's efforts to communicate and work with the department or supervising agency or other individuals for the purpose of complying with the service plan and repairing, maintaining, or building the parent-child relationship;

(iii) A positive response by the parent to the reasonable efforts of the department or the supervising agency;

(iv) Information provided by individuals or agencies in a reasonable position to assist the court in making this assessment, including but not limited to the parent's attorney, correctional and mental health personnel, or other individuals providing services to the parent;

(v) Limitations in the parent's access to family support programs, therapeutic services, and visiting opportunities, restrictions to telephone and mail services, inability to participate in foster care planning meetings, and difficulty accessing lawyers and participating meaningfully in court proceedings; and

(vi) Whether the continued involvement of the parent in the child's life is in the child's best interest.

John Downs contends that the trial court erred by not considering the good cause exception for incarcerated parents provided in RCW 13.34.145(5)(a)(iv) when it found little likelihood that he would remedy his parental deficiencies such that Jessie could return to him in the near future. He asserts that the statute means that a parent's incarceration may justify waiting longer to terminate parental rights. The State maintains

38

that the RCW 13.34.145(5)(a)(iv) exception grants a trial court discretion to prevent the State from filing a termination when good cause is found, but does not prevent a court from adjudicating a termination proceeding that has already begun.

We agree with the State. RCW 13.34.145(5)(a)(iv) allows a good cause exception to the filing of a termination of parental rights petition. The statute does not afford an exception to entry of a termination order after the filing of the petition. If John Downs wished to rely on the statute, he should have argued its applicability long before the termination trial.

RCW 13.34.180(1)(f) completes the trilogy of statutory stipulations forwarded by John Downs because of his internment. This provision directs the trial court to review three additional considerations before determining whether continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. RCW 13.34.180(1)(f) declares, in pertinent portion:

> If the parent is incarcerated, the court shall consider whether a parent maintains a meaningful role in his or her child's life based on factors identified in RCW 13.34.145(5)(b); whether the department or supervising agency made reasonable efforts as defined in this chapter; and whether particular barriers existed as described in RCW 13.34.145(5)(b) including, but not limited to, delays or barriers experienced in keeping the agency apprised of his or her location and in accessing visitation or other meaningful contact with the child.

The legislature adopted the incarcerated parent factors in 2013. Laws of 2013, ch. 173, §§ 3, 4. This court recently addressed the factors and noted that the legislature

39

mandated *consideration* of the parent's ability to maintain a meaningful role despite his custodial status. *In re Termination of Parental Rights to M.J.*, 187 Wn. App. 399, 409, 348 P.3d 1265 (2015). Nevertheless, the legislature did not demand findings for each factor. This court wrote:

> "consideration" of evidence ultimately means a weighing or balancing of facts, along with a resolution of that weighing. In many instances, particularly where the evidence is uncontested or the State's case is very strong, the court's conclusion will need no further explication.

*In re Termination of Parental Rights of M.J.*, 187 Wn. App. at 409.

The first of the three RCW 13.34.180(1)(f) considerations incorporates the six factors we previously listed from RCW 13.34.145(5)(b) when determining whether the parent maintained a meaningful role in the child's life. In other words, the new incarceration considerations contain factors upon factors. We repeat the RCW 13.34.145(5) factors:

> (b) The court's assessment of whether a parent who is incarcerated maintains a meaningful role in the child's life may include consideration of the following:
> (i) The parent's expressions or acts of manifesting concern for the child, such as letters, telephone calls, visits, and other forms of communication with the child;
> (ii) The parent's efforts to communicate and work with the department or supervising agency or other individuals for the purpose of complying with the service plan and repairing, maintaining, or building the parent-child relationship;
> (iii) A positive response by the parent to the reasonable efforts of the department or the supervising agency;
> (iv) Information provided by individuals or agencies in a reasonable position to assist the court in making this assessment, including but not

40

limited to the parent's attorney, correctional and mental health personnel, or other individuals providing services to the parent;

(v) Limitations in the parent's access to family support programs, therapeutic services, and visiting opportunities, restrictions to telephone and mail services, inability to participate in foster care planning meetings, and difficulty accessing lawyers and participating meaningfully in court proceedings; and

(vi) Whether the continued involvement of the parent in the child's life is in the child's best interest.

Downs contends that the trial court erred in failing to consider the statutory factors listed in RCW 13.34.145(5)(b) before finding that the State had met its burden to prove that Downs relationship with Jessie diminished her prospects for early integration into a stable, permanent home. The State contends that the trial court made all proper considerations under the statute.

The trial court found that John Downs had not maintained a meaningful role in Jessie's life. Nevertheless, the trial court did not enter findings with respect to the underlying RCW 13.34.145(5)(b) factors. Therefore, in light of *In re Termination of Parental Rights to M.J.*, we ascertain whether the trial court "considered" those factors.

The trial court found that John Downs did not visit Jessie after incarceration and that any visitation would have harmed Jessie. The court found that Downs made minimal efforts to communicate with DSHS and participated in only one Family Team Decision Making Meeting. The trial court heard testimony from a representative of the Department of Corrections about Downs' chemical dependency treatment and argument from his attorney about the effort undergone in prison to better himself and comport with

41

the court order. The court found that Downs completed many services available to him. The trial court repeatedly acknowledged that incarceration prevented Downs from completing services. Finally, the trial court found that visitation or contact with the father would retraumatize Jessie. In short, the court considered all of the factors in RCW 13.34.145(5)(b). The statute demands consideration of the factors, but not any particular outcome after consideration.

The second of the RCW 13.34.180(1)(f) considerations is the expenditure by DSHS of "reasonable efforts" on behalf of the parent. The statute does not define "reasonable efforts." In *M.J.*, this court interpreted the term "to require DSHS to make reasonable efforts to help the incarcerated person remedy parental deficiencies." 187 Wn. App. at 408. Our trial court found that the State offered the services available in prison. Thus, the trial court considered reasonable efforts. Although we may disagree with the trial court's conclusion that DSHS exerted reasonable efforts, we may not reverse the trial court for this reason, since RCW 13.34.180(1)(f) only requires consideration of the factor not any particular outcome.

The third and final consideration under RCW 13.34.180(1)(f) is barriers faced by the incarcerated parent. The statute does not define "barrier," nor provide courts with guidance on assessing the significance of different "barriers." In *In re Welfare of K.J.B.*, 188 Wn. App. 263, 354 P.3d 879 (2015), this court addressed the subsection. In *K.J.B.*, the trial court made no record of their consideration of the "incarceration factors." We

42

decided, nonetheless, that the trial court's failure was harmless error because the State's case was so strong. We wrote:

> [T]here is no evidence that the barriers of incarceration impacted J.B.'s ability to maintain meaningful contact with his daughter nor is there evidence that the barriers of incarceration impacted J.B.'s required assessments, services, or his ability to participate in court proceedings.

*In re K.J.B.*, 188 Wn. App. at 285.

The trial court made oral and written findings about the barriers that incarceration posed to John Downs' parenting ability. The trial court noted incarceration created a barrier to visitation with Jessie. The trial court found that imprisonment prevented Downs from obtaining services. Again, the trial court is only required to consider the barriers and not to render any particular outcome as a result of the barriers. We also must recall that the therapist recommended no visitation not only because of incarceration but because of trauma to Jessie. Downs, not DSHS, caused the trauma.

In short, the trial court considered all incarceration factors before finding that the State proved by clear, cogent, and convincing evidence that John Downs' ongoing relationship with Jessie prevented her from early integration into a stable, permanent home.

## CONCLUSION

We affirm the trial court's order terminating the paternal rights of John Downs in her daughter, Jessie.

43

No. 32941-1-III
*In re the Dependency of J.E.L.D.*

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Siddoway, C.J.

_____
Lawrence-Berrey, J.

44