**FILED**
**May 24, 2016**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Termination of Parental Rights to | ) | No. 32948-8-III |
| | ) | (consolidated with |
| M.A., | ) | No. 32949-6-III |
| E.A., | ) | No. 32950-0-III |
| R.A., | ) | No. 32951-8-III) |
| R.V.-A. | ) | |
| | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |

LAWRENCE-BERREY, J. — J.V.[1] appeals from the trial court's order terminating her

parental rights to her four children.[2] She argues that the trial court erred in finding that all

necessary services had been offered or provided because the Department of Social and

Health Services (the Department) failed to provide timely services tailored to her hearing

loss. In doing so, J.V. also argues that the Department violated both the Americans with

Disabilities Act (ADA) and Administrative Policy 7.20. Finally, J.V. argues that because

---

[1] For purposes of this opinion, the parents' and children's initials are used in place of their names.

[2] This court recently granted J.V.'s motion so she could proceed in the trial court and have it approve an open adoption agreement. This opinion has no bearing on J.V.'s rights as set forth in that agreement.

the Department did not offer proper services, it failed to prove under RCW

13.34.180(1)(e) that little likelihood existed that her parental deficiencies would be

remedied so her children could be returned to her in the near future. For the reasons

stated below, we reject her arguments and affirm the termination order.

## FACTS

A.     Events leading to dependency

J.V. is the mother of M.A. (born in May 2011), E.A. (born in May 2010), R.A.

(born in August 2007), and R.V.-A. (born in November 1998). J.A. is M.A., E.A., and

R.A.'s father, and A.A. is R.V.-A's father.[3] J.V., R.A., and R.V.-A. all have

Waardenburg syndrome and hearing loss.[4] R.A. also has cognitive delays and is likely

autistic. E.A. and M.A. do not have these conditions. J.V.'s primary language is

American Sign Language (ASL) and her secondary language is written English.[5]

The family first became involved with the Department in February 2011. At this

point, J.V. and J.A. lived together with the four children, had housing, and had access to a

---

[3] The trial court terminated J.A.'s and A.A.'s parental rights by default before the trial in this case, and neither are parties to this appeal.

[4] Waardenburg syndrome is a genetic disorder that causes pigmentation issues in the eyes and hair, profound hearing loss, and changes in facial proportion.

[5] ASL and English are two entirely different languages—it is a common misperception that ASL is simply signed English.

2

relay phone system.[6] Child Protective Services (CPS) received a report that R.A. "escaped," and that someone found her wandering several blocks from J.V.'s home. Ex. P1 at 3. The Department was concerned about the lack of structure and routine in the home, lack of parenting skills, and was also concerned that R.A.—who was almost four years old—was noncommunicative. The Department attempted to put Family Preservation Services (FPS) in the home several times. During the first round, the family only participated in one of the four FPS sessions and the Department terminated FPS. The Department referred J.V. and J.A. for FPS two more times and the parents attended a few sessions, but they ignored the services FPS offered and did not improve their parenting skills.

---

[6] A relay cell phone has a front-facing camera, and the user downloads an application and subscribes to a video relay service provider. The person makes a video call through the relay service, and the application connects the person with an ASL interpreter. The person signs for the interpreter, and the interpreter then relays the message to the person on the other end of the line in audible speech. The person on the other end of the line then responds in audible speech, and the interpreter relays the message to the caller in ASL. A teletypewriter, in contrast, is a typewriter-sized keyboard connected to a land line, where the person who is hard of hearing places the call, types his or her message, and an operator relays that message to the person on the other end of the phone in audible speech.

3

The Department filed a dependency petition in March 2012. At the shelter care hearing the trial court ordered the children to remain in J.V.'s and J.A.'s care, but also ordered random urinalysis (UA) and breath alcohol (BA) testing, a domestic violence assessment, FPS services, weekly contact with the Department, no other adults in the home, and for the parents to use the light and motion sensors. The trial court also ordered J.V. and J.A. to enroll E.A. in early head start and to enroll R.A. in Division of Developmental Disabilities (DDD) services.

The FPS provider and guardian ad litem (GAL) visited J.V.'s and J.A.'s home and saw that the home was very dirty and cluttered, which the parents blamed on R.V.-A. The children were dressed in dirty clothes, food was on the floor, and the children would crawl around and eat the food. The Department was also concerned that J.V. and J.A. were not complying with services, left the children unsupervised, and also allowed the children to use the pool belonging to their next door neighbor, who was a registered sex offender. The Department moved the trial court to place the children in foster care. J.V. and J.A. agreed to place the children with J.A.'s parents, and the Department later placed them with foster families. The Department assigned social worker Marci Crocker to the case.

4

J.V. agreed to dependency on May 9, 2012. J.V. agreed to participate in random UA/BA monitoring, anger management, domestic violence prevention services, family therapy, and a neuropsychological evaluation.

B.      J.V.'s engagement with services

1.      Counseling

Ms. Crocker referred J.V. for anger management and domestic violence prevention services through Bridges of Safety on March 12, 2012 and again on June 12, 2012. J.V. did not comply with those services. At the August 16, 2012 review hearing, the trial court ordered for these services to be addressed through individual counseling instead.

Ms. Crocker referred J.V. for family therapy with Mary Anne Sacco twice. Ms. Crocker referred J.V. to Ms. Sacco to address a number of issues, such as how J.V. lacked parenting skills, used drugs, generally ran the family poorly, did not provide safety in the home, did not supervise the children, and allowed the children to witness domestic violence. Ms. Sacco attempted to meet with J.V. several times, and was able to meet with her once at a restaurant by J.V.'s house.

Ms. Sacco made another appointment with J.V. after this first meeting, but J.V. did not show up for the appointment. Ms. Crocker then arranged for Ms. Sacco to attend a visitation with Lynn Lumsden—an ASL interpreter who is also a mental health

therapist—so that Ms. Lumsden would be able to translate different parenting techniques between Ms. Sacco and J.V. J.V. did not attend this visitation. Ms. Sacco kept these appointments scheduled every Monday with the hope that J.V. would attend, and Ms. Crocker arranged for transportation and interpreters for these appointments, but J.V. never contacted Ms. Sacco.

Ms. Crocker also referred J.V. for individual counseling. She first referred J.V. for counseling with Karen Lydon because Ms. Lydon is also an ASL interpreter. Ms. Lydon was unable to take any new clients, so Ms. Crocker referred J.V. to Megan Stofergen. J.V. met with Ms. Stofergen at least one time, and Ms. Lumsden served as the interpreter. Ms. Crocker referred J.V. to Ms. Stofergen again after J.V. and R.V.-A. asked for counseling together, and Ms. Crocker scheduled three or four sessions. R.V.-A showed up for all of these sessions, but J.V. did not. On June 21, 2013, Ms. Crocker referred J.V. for individual therapy with Steven Erickson, with Ms. Lumsden as the interpreter. J.V. did not attend these sessions, although Ms. Crocker may not have been in contact with J.V. at this time. On September 24, 2013, Ms. Crocker scheduled another session with Ms. Stofergen, R.V.-A., and J.V., with Ms. Lumsden serving as interpreter. J.V. no-showed. Ms. Crocker rescheduled this meeting for October 1, and then again on October 8, October 15, and October 23. J.V. no-showed each time.

Ms. Crocker was exchanging "constant e-mails" with J.V. during this time. Report of Proceedings (RP) at 36. J.V.'s responses to Ms. Crocker indicated she received notice of the appointments, and after her no-shows she would provide various excuses as to why she was not there, such as an inability to find the address. Despite receiving simple and clear directions to the appointment, J.V. still would not show.

### 2. Neuropsychological evaluation

For the neuropsychological evaluation, Ms. Crocker originally contacted Dr. Jennifer Van Wey. However, Dr. Van Wey told Ms. Crocker that J.V. needed a psychologist who was fluent in ASL, and referred Ms. Crocker to Dr. Jaime Wilson. Dr. Wilson is located in Tacoma, Washington, and Ms. Crocker arranged for him to travel to Spokane to complete J.V.'s evaluation on October 11, 2012, and R.A.'s evaluation on October 12, 2012. Ms. Crocker transported J.V. and R.A. to the evaluations.

Dr. Wilson determined that J.V. has below average intelligence, is mildly impaired, and likely would not be able to live independently on her own without assisted living support. J.V. told Dr. Wilson that she used methamphetamine and marijuana, and that she did not think she could stop. Dr. Wilson diagnosed J.V. with bipolar disorder type 2, borderline intellectual functioning, as well as cannabis, hydrocodone, and prior methamphetamine abuse. Dr. Wilson recommended weekly UAs and BAs for two years,

7

medication workup with a psychotherapist, one-on-one parenting instruction on raising an autistic child, supervised visitation, and financial planning. He also recommended psychotherapy sessions, and offered to provide psychotherapy to J.V. via Skype. On April 23, 2013, Ms. Crocker e-mailed J.V. and offered individual counseling with Dr. Wilson via Skype. J.V. refused to see him.

### 3. Chemical dependency

Ms. Crocker referred J.V. for UAs two days per week, and e-mailed J.V. and J.V.'s trial counsel the times the UAs were scheduled. The first week of the UAs, the Department inadvertently told J.V. the wrong days for her UA appointments, but Ms. Crocker fixed the problem by the second week. Between March 2012 and January 2014, J.V. no-showed for UAs 58 times. J.V. tested positive for marijuana seven times, and tested negative twice. Consequently, the trial court ordered a chemical dependency assessment. To complete this assessment, Ms. Crocker referred J.V. to Partners with Families and Children on July 31, 2012, Spokane Addiction Recovery Centers (SPARC) on October 6, 2012, Bobby Uglioni on October 16, and Adept Assessment Center on November 26.[7]

---

[7] The record does not definitively indicate whether J.V. attended these appointments, and if so, what the results of these appointments were.

In June 2013, Ms. Crocker again referred J.V. to SPARC for a chemical dependency assessment, and scheduled the appointment for June 21. Ms. Crocker hand-delivered J.V. a service letter on June 20, which contained information about the appointment. J.V. no-showed. Ms. Crocker set up the appointment again for June 26 and requested an interpreter, and J.V. attended. However, SPARC was unable to diagnose J.V. at that appointment, due to J.V.'s inconsistent answers and a lack of collateral information. Ms. Crocker then brought SPARC collateral medical information. Ms. Crocker scheduled another appointment with SPARC for September 25, 2013, and neither J.V. nor the interpreter attended. Ms. Crocker rescheduled the appointment for October 13, 2013, and J.V. no-showed again. J.V. never completed the evaluation, and never entered treatment.

### 4. Visitation

Over the course of the dependency, Ms. Crocker made five referrals for visitations at Fulcrum Institute, a family-oriented dispute resolution facility. Ms. Crocker arranged interpreters for all of these visits. Ms. Crocker first referred J.V. and the four children for bi-weekly visits at Fulcrum on May 10, 2012. J.V. attended these visits consistently at the beginning of the dependency, and demonstrated appropriate parenting behavior during these visits. J.V. would use her relay phone to confirm the visits with Fulcrum, but

9

eventually started sending e-mails to Fulcrum to confirm the visits. At each visit, Fulcrum gave J.V. confirmation for the next visit. J.V. missed visits on July 11, 2012, and August 7, 2012, and Fulcrum dismissed her from the program.

Ms. Crocker referred the family to Fulcrum again and visits continued through October 15, when Fulcrum dismissed J.V. a second time. Ms. Crocker referred the family again, but J.V. canceled that visit. J.V. attended weekly visits between February 17, 2013, and June 30, 2013. Ms. Crocker updated the referral and visits occurred sporadically from July 2013 through December 2013—there were nine successful visits, J.V. either no-showed or canceled nine times, the interpreter no-showed twice, and the foster family canceled twice because the children were sick. J.V. did not attend a visit from September 29, 2013 up to the time of the termination trial. Ms. Crocker made her fifth referral to Fulcrum on January 7, 2014. Ms. Crocker e-mailed J.V. and told her that J.V. just needed to e-mail Fulcrum and set the visits up, but J.V. never did.

> 5. The Department's efforts to communicate with J.V. regarding appointments

In the beginning of the case, Ms. Crocker offered special mobility services to get J.V. to her appointments. This service picks a person up, takes that person to his or her appointment, then takes the person home after the appointment. Ms. Crocker would also transport J.V. to counseling and doctor's appointments.

Throughout the course of the dependency, Ms. Crocker communicated with J.V. via constant e-mails, back and forth, to tell her about her appointments. Ms. Crocker would also update J.V. on what was happening with the children, and when doctor's visits were scheduled. J.V. usually responded to most of Ms. Crocker's e-mails. After missing her appointments, J.V. would e-mail Ms. Crocker and tell her, for instance, that she could not find the provider's office. Ms. Crocker would respond with simple directions, but J.V. would continue to no-show.

J.V. was usually receptive to Ms. Crocker's e-mails. However, some of J.V.'s e-mails seemed threatening to Ms. Crocker. In October 2013, J.V. claimed that she did not have a phone. So Ms. Crocker sent J.V. a text message from a different cell phone, and J.V. responded to the text message and asked who the number belonged to. Ms. Crocker identified herself. J.V. then e-mailed Ms. Crocker and called her a "stupid F'er." RP at 60. J.V. also would e-mail Ms. Crocker and tell Ms. Crocker that she was not doing what she was supposed to be doing, and that J.V. would "send the FBI out to get [her]." RP at 60.

Ms. Crocker also sent J.V. service letters, which contained the date, time, address, telephone number, and agency for each appointment. Ms. Crocker would also offer to transport J.V. In the beginning of the case, Ms. Crocker would not always have an

11

interpreter, so she would go to J.V.'s home and the two would write notes back and forth. Later on, Ms. Crocker would usually go to J.V.'s home with an interpreter.

Ms. Crocker arranged for ASL interpreters to be present at all of these appointments. Ms. Crocker also arranged for interpreters to be at all the meetings between herself and the GAL. The Department contracted with a local ASL interpreter services company in June 2012, and the company supplied interpreters for visitation and service appointments. The Department arranged and paid for 309 hours of interpreter services. Between July 3, 2012, and August 4, 2014, there were 36 appointment cancellations, only two of which were the company's responsibility.

Around July 2013, J.V. lost her housing and moved in with a friend. Ms. Crocker had an address to J.V.'s new house and attempted to meet with J.V. at that house with other social workers, but no one would answer the door. This same month, J.V. moved the trial court to supply her with a smart phone with relay capabilities. The trial court ordered the Department to provide J.V. a smart phone. Ms. Crocker purchased a phone and gave it to J.V., but discovered that week that the phone was not equipped with relay capabilities. Ms. Crocker then attempted to get J.V. a relay phone, but had trouble obtaining one because of reimbursement issues with the Department's voucher system. Ms. Crocker made numerous calls, but kept hitting dead ends with the Department.

During this time, J.V. still e-mailed Ms. Crocker constantly. Ms. Crocker still scheduled J.V.'s appointments and e-mailed J.V. with information about when those appointments were scheduled. Ms. Crocker knew that J.V. already had a separate cell phone she regularly used, and during this time Ms. Crocker watched R.V.-A. exchange several text messages with J.V.—confirming that J.V.'s regular phone worked. The smart phone was supposed to be for emergencies and to allow J.V. to schedule her own appointments, but Ms. Crocker determined that she should still schedule J.V.'s appointments herself in order to reduce any barriers to J.V. receiving services. J.V.'s trial counsel was simultaneously working to get J.V. a smart phone, and successfully got her one in November 2013. After J.V. got the relay phone, J.V. said that she either lost or broke it.

At the time of the termination trial, Ms. Crocker did not know where J.V. lived. Ms. Crocker continued to contact J.V. in the months leading up to the termination trial and continued to offer to make appointments for her and to get J.V. into services, but J.V. was unwilling to engage.

C.    Review hearings

The trial court held a review hearing on August 16, 2012. The trial court found that J.V. was noncompliant with all services, except that J.V. had scheduled her

13

neuropsychological evaluation and had met with Ms. Sacco the day before. The trial

court ordered the same services to continue, and also ordered J.V. to begin hands-on

parent training and individual counseling.

The trial court held a permanency planning review hearing on December 20, 2012.

The trial court found that J.V. had completed her neuropsychological evaluation, but was

noncompliant with all other services. The permanency plan for the children was to return

them to J.V.'s care.

The trial court held a regular review hearing on May 9, 2013. The trial court found

that J.V. was noncompliant with all of her services. The permanency plan was still to

return them to J.V.'s care.

The trial court held another permanency planning review hearing on October 10,

2013. The trial court found that J.V. was compliant with individual counseling with Ms.

Stofergen and had attempted to complete the chemical dependency assessment at SPARC,

but was noncompliant with all other services. The trial court modified the permanency

plan for the children to adoption. On October 13, 2013, J.V. gave birth to a fifth child.[8]

At the birth, both J.V. and the new baby tested positive for methamphetamine.

---

[8] The new child is not involved in this case.

14

The trial court held another regular review hearing on April 10, 2014. The trial court found that J.V. was noncompliant with all services. J.V. was not present at the hearing, but showed up after the hearing was over. Around this time, J.A. posted on Facebook that he had tuberculosis. Accordingly, the trial court ordered both parents to complete tuberculosis testing before any additional visits or services could proceed.

D.    Termination

The Department filed the termination petition on April 23, 2013. The termination trial commenced August 4, 2014. At trial, Ms. Crocker testified that she did not foresee that J.V. would follow through in the near future because at that point J.V. had not followed through in the last two years. Ms. Crocker testified that all services the court ordered were either offered or provided, and there were no other services that could have been offered.

The GAL testified that during the time she worked with the family she did not see J.V. make any progress to get to the point where her children could be returned. She also testified that the Department constantly tried to set up appointments for J.V. and then J.V. would no-show, that J.V. would not take responsibility for herself, and that J.V.'s low motivation for change disturbed her. The GAL testified that, in her opinion, "all the services that these parents needed were in place," and that the Department was "going

15

above and beyond their duty to provide services again and again, reapplying and re-setting up services when [the parents] get exited from programs for no-shows." RP at 280. Finally, the GAL testified that she knew "there was a big issue about the cell phone, but it certainly seemed to me that [J.V.] had access and was able to text [R.V.-A.] on a regular basis." RP at 280.

Dr. Wilson testified that direct one-on-one ASL communication, specifically with psychotherapy and parenting skills, would have been able to help J.V. Dr. Wilson specifically recommended one-on-one therapy with a provider who was fluent in ASL because

> [o]btaining those types of services in a general setting with a sign language interpreter would be less effective because, for one, it's not meeting [J.V.'s] direct communication needs. . . . So when you're trying to get communication through a third person through an interpreter, it's not considered to be equal access as it would be with direct communication.

RP at 318. However, Dr. Wilson noted that this service "can be really difficult to find because there's not a lot of individual providers that know ASL fluently and can communicate at the level that [J.V.] would need." RP at 318. Dr. Wilson testified that there are some "creative ways to be able to provide direct ASL communication," such as through a relay phone, and that "it's almost better to not obtain services through a

16

secondary communication mechanism," due to the potential for erroneous conclusions and invalid diagnoses. RP at 319.

Dr. Wilson noted J.V. had poor judgment and insight, borderline intellectual functioning, bipolar disorder, and a significant deficit in functioning. The Department asked Dr. Wilson if J.V. could remedy the parenting deficits he identified in the near future, and Dr. Wilson testified that "[i]t probably would not be in the near future, most likely would be on a long term basis because of the cognitive deficits that were demonstrated." RP at 321.

Following presentation of the evidence and closing arguments, the trial court granted the Department's petition to terminate J.V.'s parental rights to M.A., E.A., R.A., and R.V.-A. In ordering termination, the trial court found that the Department had established each of the six elements contained in RCW 13.34.180(1) by clear, cogent, and convincing evidence. The findings specifically listed the services offered or provided to J.V., and also listed the specific reasons supporting the trial court's finding that conditions could not be remedied so the children could be returned to J.V. in the near future. J.V. appeals.

17

ANALYSIS

Parents have fundamental liberty and privacy interests in the care and custody of their children. *In re Welfare of A.J.R.*, 78 Wn. App. 222, 229, 896 P.2d 1298 (1995). Thus, terminating parental rights should be allowed only "'for the most powerful reasons.'" *Id.* (internal quotation marks omitted) (quoting *In re Sego*, 82 Wn.2d 736, 738, 513 P.2d 831 (1973)).

Washington courts use a two-step process when deciding whether to terminate parental rights. *In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232 P.3d 1104 (2010); RCW 13.34.190. First, the Department must show that the statutory requirements in RCW 13.34.180(1) are established by clear, cogent, and convincing evidence. *A.B.*, 168 Wn.2d at 911. Second, the Department must show the termination is in the best interests of the child by a preponderance of the evidence. *Id.* "Only if the first step is satisfied may the court reach the second." *Id.*

A.    *First step: RCW 13.34.180(1) factors*

Under the first step, the statutory requirements that the State must allege and prove by clear, cogent, and convincing evidence are set forth in RCW 13.34.180(1):

(a) The child has been found to be a dependent child;

(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;

(c) That the child has been removed . . . from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . .

. . . .

(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. . . .

Evidence is clear, cogent, and convincing if it shows the ultimate fact at issue is highly probable. *In re Dependency of K.S.C.*, 137 Wn.2d 918, 925, 976 P.2d 113 (1999). On review, the trial court's findings will not be overturned if supported by substantial evidence. *Id.* Evidence is substantial if it is sufficient to persuade a fair-minded person of the truth of the declared premise. *In re Welfare of C.B.*, 134 Wn. App. 942, 953, 143 P.3d 846 (2006). Because the trial court has the opportunity to hear the testimony and observe the witnesses, its factual findings are entitled to great deference. *K.S.C.*, 137 Wn.2d at 925. This court does not make credibility determinations or weigh evidence on review. *C.B.*, 134 Wn. App. at 953.

J.V. raises four issues related to the first step. We take them in order.

1.      All necessary, reasonably available, services

The trial court may not terminate parental rights unless the Department proves "[t]hat the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided." RCW 13.34.180(1)(d). "This encompasses 'all reasonable services that are available within the agency, or within the community, or those services which the department has existing contracts to purchase' in order to enable a parent 'to resume custody.'" *In re Dependency of T.L.G.*, 126 Wn. App. 181, 198, 108 P.3d 156 (2005) (quoting former RCW 13.34.136(1)(b)(i), (iv) (2000)). A service is necessary within the meaning of the statute if it is needed to address a condition that precludes reunification of the parent and child. *In re Welfare of C.S.*, 168 Wn.2d 51, 56 n.3, 225 P.3d 953 (2010). "To meet this statutory burden, the State must tailor the services it offers to meet each individual parent's needs." *In re Welfare of S.J.*, 162 Wn. App. 873, 881, 256 P.3d 470 (2011).

To meet its burden under RCW 13.34.180(1)(d), the Department must show it offered or provided J.V. the required services, and that J.V. either failed to engage or

20

waived her right to such services. *In re Welfare of S.V.B.*, 75 Wn. App. 762, 770, 880 P.2d 80 (1994). A parent's unwillingness or inability to avail himself or herself of remedial services within a reasonable period is highly relevant to this court's determination of whether the elements of RCW 13.34.180 are established. *In re Dependency of C.T.*, 59 Wn. App. 490, 499, 798 P.2d 1170 (1990).

If a parent is unwilling or unable to make use of the services offered or provided, the Department is not required to offer additional services that might have been helpful. *In re Dependency of S.M.H.*, 128 Wn. App. 45, 54, 115 P.3d 990 (2005). "[B]ecause RCW 13.34.180(1)(d) limits the services required to those capable of remedying parental deficiencies in the 'foreseeable future,' the trial court can find that the Department offered all reasonable services '[w]here the record establishes that the offer of [other] services would be futile.'" *In re Welfare of K.J.B.*, 188 Wn. App. 263, 278, 354 P.3d 879 (2015) (second and third alterations in original) (quoting *In re Welfare of M.R.H.*, 145 Wn. App. 10, 25, 188 P.3d 510 (2008)), *review granted*, 184 Wn.2d 1033, 366 P.3d 932 (2016).

J.V. argues that the Department failed to offer or provide all necessary services tailored to her disability because the Department provided services through providers who were not fluent in ASL and provided interpreters to translate, rather than using providers

21

who were themselves fluent in ASL. J.V. points to Dr. Wilson's testimony and the trial court's finding that "[s]ervices recommended would be best directly provided by individuals fluent in ASL as opposed to through interpreters." Clerk's Papers (CP) at 191. The trial court considered Dr. Wilson's testimony at trial and nevertheless found that

> [t]he services reasonably available were provided in a manner that was understandable by [J.V.] that took into account her disability. It was necessary for the Department to tailor services for this mother, and the Department did this.

CP at 191. The trial court found that the Department either offered or provided all necessary services, noting that J.V. "did not engage in any service, and made no progress in remedying her parental deficiencies." CP at 194.

Substantial evidence supports the trial court's finding that the Department tailored the services it offered to J.V.'s disability. Dr. Wilson testified that it "can be really difficult to find" providers who are fluent in ASL. RP at 318. Nevertheless, the Department originally contacted Ms. Lydon to provide J.V. therapy, but Ms. Lydon was unable to take any new clients. The Department offered J.V. individual counseling with Dr. Wilson—who was fluent in ASL—and J.V. refused to see him. Consequently, the Department provided Ms. Lumsden as the interpreter for the therapy sessions J.V. was supposed to have with Ms. Sacco, Ms. Stofergen, and Mr. Erickson. The Department did

22

this because Ms. Lumsden is also a mental health therapist and, therefore, would be the best at translating different parenting techniques.

Despite the Department's efforts to provide J.V. with services tailored to her disability, J.V. simply refused to engage. J.V. met with Ms. Sacco once and Ms. Stofergen at least one time. Other than these two meetings, the record is replete with dozens of service appointments where J.V. either canceled or simply no-showed. J.V. did not attempt anger management and domestic violence prevention services. After the first sessions with Ms. Sacco and Ms. Stofergen, J.V. no-showed for every other remaining appointment. The Department arranged and paid for 309 hours of interpreter services, yet there were 36 appointment cancellations, only two of which were the interpretation company's fault.

J.V. no-showed for UAs 58 times, and after SPARC was unable to diagnose J.V. at the initial assessment, J.V. no-showed for the reassessment. Ms. Crocker continued to contact J.V. in the months leading up to the termination trial and continued to offer to make appointments for her and to get J.V. into services, but J.V. was unwilling to engage. Because the record establishes that J.V. was unwilling to make use of the services offered, the Department was not required to offer other services—such as services with ASL-fluent providers—that might have been helpful. *S.M.H.*, 128 Wn. App. at 54.

J.V. similarly argues that the Department failed to tailor the services it provided J.V. when it gave her applications for the relay phone and housing, which were in written English. However, J.V. never attempted to fill out the two-page application. Ms. Crocker gave J.V. the forms on multiple occasions, may have called and scheduled an appointment to apply for housing, and offered to assist J.V. in filling out the forms. As with the other services, RCW 13.34.180(1)(d) did not require the Department to go to unreasonable lengths to tailor the services it offered when J.V. was unwilling to engage in them.

J.V. further argues that the Department offered her services and communicated information about her appointments in written English, rather than through ASL. J.V. argues that she "cannot be faulted with the failure to follow through with services when the offers of services were essentially offered to her in a foreign language." Br. of Appellant at 20. J.V. cites Dr. Wilson's testimony that because ASL and written English are different languages, written English "would not be an effective way to communicate with a deaf individual and it would not be considered equal access." RP at 338.

While ASL is J.V.'s first language, the record establishes that J.V. was quite capable of communicating in written English. When Ms. Crocker e-mailed J.V. to remind her about her appointments, J.V. would e-mail back. The record establishes that J.V. actually knew when she was supposed to be at her appointments, as evidenced by the fact

that she would e-mail Ms. Crocker after she missed her appointments and tell Ms. Crocker, for instance, that she could not find the provider's office.

Other evidence establishes that J.V. was capable of communicating in written English. J.V. e-mailed Ms. Crocker several times to report instances of domestic violence between her and J.A., would send text and Facebook messages to R.V.-A., would e-mail Fulcrum to confirm her visitation appointments, and e-mailed Ms. Sacco to cancel and reschedule their appointments. J.V. e-mailed Ms. Crocker to tell her that J.A. had tuberculosis. When Ms. Crocker used a different phone number to send J.V. a text message, J.V. e-mailed Ms. Crocker and called her a "stupid F'er." RP at 60. J.V. has been able to communicate with multiple people via writing notes back and forth in English. Therefore, the "constant e-mails" and service letters Ms. Crocker sent or hand-delivered J.V. were communicated in a manner J.V. could understand and narrowly tailored to her disability.

We conclude the Department offered or provided J.V. all necessary, reasonably available services, which were tailored to J.V.'s hearing loss, and therefore proved RCW 13.34.180(1)(d) by clear, cogent, and convincing evidence.

### 2.    Compliance with the ADA

In a related argument, J.V. maintains that the termination of her parental rights violated the ADA because the State failed to reasonably tailor the services it offered to accommodate her disability. She argues that the Department failed to tailor her services because it did not provide J.V. services from individuals fluent in ASL, nor did it communicate with her in ASL, but rather through written English.

The ADA prohibits a public entity from discriminating against disabled persons by excluding them from participation in or denying them the benefits of public services and programs. 42 U.S.C. § 12132. The ADA requires the state or other public entity to make reasonable accommodations to allow the disabled person to receive the services or to participate in the public entity's programs. 28 C.F.R. § 35.130(b)(7).

Here, it is undisputed that J.V. is a qualified individual with a disability and thus protected under the ADA. However, no Washington court has addressed the question of whether an ADA violation provides an independent basis for reversing a termination order. In *A.J.R.*, this court recognized that the ADA requires the State to make reasonable accommodations to allow disabled persons to receive services or to participate in its programs. *A.J.R.*, 78 Wn. App. at 230. But it did not directly reach the question of whether a parent may raise the ADA as a defense to the termination of parental rights.

Instead, the *A.J.R.* court found on the facts presented that the Department, by providing services designed to meet the parent's special needs, had met any obligations that the ADA might impose. *Id.*

Here, as in *A.J.R.*, we reject J.V.'s ADA claim on the same basis we rejected her challenge under RCW 13.34.180(1)(d). As we discussed above, the Department offered to provide her psychotherapy with Dr. Wilson, who is one of the few providers in the region who is fluent in ASL. J.V. refused the Department's offer. The Department also provided interpreters for all of J.V.'s service appointments, and J.V. failed to attend services. Finally, although written English is J.V.'s second language, the record contains ample evidence that J.V. is sufficiently proficient in written English to have understood when and where her appointments were scheduled. The record establishes that J.V.'s disability was not the reason for her failure to engage in necessary services; rather, J.V.'s failure was due to her lack of motivation. Accordingly, we reject J.V.'s ADA claim for the same reason that we rejected her challenge under RCW 13.34.180(1)(d).

3.    Compliance with Administrative Policy 7.20

J.V. also argues that the Department violated DSHS Administrative Policy 7.20, which requires the Department to provide accommodations to make its programs and services equally accessible to people who are deaf. J.V. argues that the Department

27

violated Administrative Policy 7.20 because the Department communicated with J.V. through written English, did not timely comply with the trial court's order to provide her with a smart phone with relay capabilities, and gave her applications in English to fill out on her own.[9]

Administrative Policy 7.20 requires the Department to "provide equal access opportunities to people with hearing loss or people with speech disabilities so they may participate in or benefit from programs, services, or activities in accordance with the ADA." Ex. R101 at 6. The policy requires the Department to "make available appropriate auxiliary aids and services where reasonably necessary to provide effective communication." *Id.* The policy lists a number of examples of "auxiliary aids," which include qualified interpreters and written materials. *Id.* at 2.

First, J.V. argues that the Department violated the policy because it communicated service appointment information with J.V. through written English. However, the policy lists "written materials" as an acceptable auxiliary aid under appropriate circumstances. *Id.* at 2. The Department used written materials to communicate the basic information regarding the service appointments to J.V., and then always provided the services

---

[9] Like with the ADA issue, J.V. cites no authority that would allow this court to reverse a termination order on the basis that the Department failed to comply with an agency policy.

themselves through an interpreter—another appropriate auxiliary aid under the policy. Again, the record makes clear that J.V. is sufficiently proficient in written English to have comprehended Ms. Crocker's e-mails and service letters, which told her when and where she needed to be at her appointments. In doing so, the Department fulfilled its obligation to "provide effective communication" under the policy. *Id.* at 6.

Second, J.V. argues that the Department violated the policy when it failed to timely comply with the trial court's order, dated July 26, 2013, which required the Department to provide J.V. with a smart phone by the October 10, 2013 review hearing. The record reflects, and the trial court found, that Ms. Crocker did not ignore the trial court's order to get J.V. a smart phone and tried hard to obtain one, but had trouble obtaining one because of reimbursement issues with the Department's voucher system. J.V.'s trial counsel eventually got her a smart phone in November 2013. In its oral ruling, the trial court criticized how the Department handled the smart phone situation, and noted that bureaucratic issues within the Department regarding how it would pay for J.V.'s smart phone did not excuse the Department from its obligation to follow its own administrative policy.

Nevertheless, the trial court found that "[t]he cell phone issue did not create a barrier to the mother engaging in the services." CP at 192. Substantial evidence supports

the trial's court's finding. Ms. Crocker testified that the purpose of getting J.V. a smart phone with relay capabilities was that so J.V. could use it in case of an emergency, and also so that J.V. could set up her own service appointments if she wanted to do that. However, Ms. Crocker still set up all of J.V.'s appointments in order to make it easier on J.V., and then Ms. Crocker and J.V. exchanged e-mails regarding the times J.V. needed to be at the appointments. Moreover, the record shows that J.V. already had a separate functional cell phone that she regularly used throughout the entire time that Ms. Crocker attempted to get her a smart phone.

Finally, J.V. argues that the Department violated the policy when it gave her an application for the relay phone—which was in written English—and expected her to be able to complete it. However, J.V. never attempted to fill out the two-page application, even though Ms. Crocker offered to help her.

We conclude that the Department did not violate Administrative Policy 7.20 because the Department and J.V. were able to effectively communicate by text and by e-mail throughout the entire dependency. We further conclude that the Department's failure to timely obtain a smart phone for J.V. did not create a barrier to J.V. engaging in services.

30

### 4. Likelihood for remedying parental deficiencies in near future

J.V. finally argues that because the Department did not offer proper services, it failed to prove under RCW 13.34.180(1)(e) that little likelihood existed that her parental deficiencies would be remedied so her children could be returned to her in the near future.

The Department must prove "[t]hat there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." RCW 13.34.180(1)(e). The focus of this element is whether the identified deficiencies have been corrected. *M.R.H.*, 145 Wn. App. at 27. If the parent is unable to resolve his or her deficiencies within 12 months after the child has been declared dependent, the statute's rebuttable presumption applies and the burden of production shifts to the parent, although the Department must still prove it is highly probable the parent would not improve in the near future. *In re Welfare of T.B.*, 150 Wn. App. 599, 608, 209 P.3d 497 (2009).

"A parent's unwillingness to avail herself of remedial services within a reasonable period is highly relevant to a trial court's determination as to whether [the Department] has satisfied RCW 13.34.180(1)(e)." *Id.* Even if some evidence suggests that the parents may eventually be capable of correcting his or her deficiencies, termination is still

31

appropriate where the deficiencies will not be corrected within the foreseeable future. *In re Welfare of A.G.*, 155 Wn. App. 578, 590, 229 P.3d 935 (2010).

The trial court found that

[t]here is little likelihood that conditions will be remedied so that the children can be returned to the mother in the near future. Dr. Wilson found that in order for any change in the mother, she would need at a minimum long term individual therapy along with supportive living arrangements and to be drug free. The mother has not maintained a relationship with her children during the past two years of the dependency matters, and has not seen her children for over 8 months. She has very little, if any, motivation to change.

CP at 195. The trial court concluded that the parent-child relationship had not improved in spite of all the efforts Ms. Crocker made, that J.V. did not take advantage of any of the numerous services the Department offered, and therefore the Department established RCW 13.34.180(1)(e) by clear, cogent, and convincing evidence.

Substantial evidence supports the trial court's finding. As discussed above, the Department offered all necessary services to J.V. that were tailored to J.V.'s disability, but she was unwilling to make use of them in the 27 months her children were in out-of-home care. When progress has not been made in 12 months following dependency, a rebuttable presumption rises that little likelihood exists conditions will be remedied so that the child can be returned to the parent in the near future. Because J.V. failed to

32

produce evidence rebutting the presumption, substantial evidence supports the trial court's RCW 13.34.180(1)(e) finding.

J.V. argues that the witnesses simply regurgitated the language of RCW 13.34.180(1)(e), and this was insufficient to support the trial court's factual finding. However, the Department's witnesses did not parrot the language of the statute—they gave specific reasons as to why they believed little likelihood remained for remedying conditions in the near future. The GAL specifically testified that she did not think the children could be returned to J.V. in the near future because J.V. repeatedly no-showed at appointments the Department scheduled, continued to pursue domestic violence relationships with J.A., lacked motivation to change herself, and would not take responsibility for what she needed to do. Ms. Crocker identified J.V's lack of follow through with services.

Similarly, Dr. Wilson testified that "[i]t probably would not be in the near future, most likely would be on a long term basis because of the cognitive deficits that were demonstrated." RP at 321. Dr. Wilson was referring to his earlier diagnoses that J.V. has poor judgment and insight, has below average intelligence and borderline intellectual functioning, has bipolar disorder, and has a significant deficit in functioning. Dr. Wilson testified that J.V.'s motivation to change was very low, and that she would have a

33

difficult time severing herself from her domestic violence relationship. This evidence far

exceeds a simple parroting of the required standard.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

Lawrence-Berrey, J.

WE CONCUR:

Fearing, C.J.

Korsmo, J.